

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-16-00366-CR

———————————————

RAYMOND LUMSDEN, Appellant

V.

THE STATE OF TEXAS

———

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F15-1103-211

———

Before Walker, Meier, and Birdwell, JJ.
Opinion by Justice Meier

## OPINION

### I. Introduction

A jury found Appellant Raymond Lumsden guilty of aggravated sexual assault of a child, indecency with a child, and criminal solicitation of a minor and assessed his punishment at confinement for life for each offense, and the trial court ordered the three life sentences to run consecutively. *See* Tex. Penal Code Ann. §§ 15.031, 21.11, 22.021 (West Supp. 2018) (setting forth elements of the offenses of criminal solicitation of a minor, indecency with a child, and aggravated sexual assault of a child, respectively). In fourteen issues, Lumsden appeals his convictions and sentences. We affirm.

### II. Background[1]

#### A. The Victim

Allison,[2] who was almost nine years old at the time of the trial, testified that after her mother Kelly started dating Lumsden, they moved in with him. Allison had her own room at Lumsden's house.

---

[1]Because Lumsden challenges the sufficiency of the evidence to support his conviction for criminal solicitation of a minor, which requires the victim's testimony to be corroborated, we set forth the trial testimony by witness.

[2]We use a pseudonym to refer to the complainant, her mother, and all minors. *See* Tex. R. App. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

On the night in question, Kelly went to bed early because she was not feeling well. Allison's brother David had also gone to bed. Allison stayed up late watching television with Lumsden. At one point, she went upstairs to grab a blanket and a pillow because she was really sleepy. She laid down beside Lumsden, who was sitting on the couch watching television. While Allison was laying on her back on the couch, Lumsden put his pointer finger under her purple and pink monkey pajamas and under her panties and touched her "privates." Allison said that Lumsden touched the outside of her private that she used to pee and that his pointer finger stayed still, which made her "[a] little uncomfortable." Lumsden touched the inside of the part that Allison used to poop. Allison testified that Lumsden wanted her to touch "the thing he went pee with," but she said no. Allison became hungry and asked for red Jell-O, which Lumsden allowed her to have. Afterwards, Lumsden went to bed, and she slept on the couch because she was too tired to go upstairs to her room. Allison testified that the time on the clock reflected that it was midnight.

The next morning, after Kelly came downstairs and woke up Allison, Allison told her that Lumsden had touched her privates. Kelly then took Allison to the police station, and from there, the police escorted Kelly and Allison to the hospital. Allison told a nurse what Lumsden had done to her and underwent a physical exam.

The following day, Allison recounted the touching to a forensic interviewer at the Children's Advocacy Center. Allison thereafter began seeing a counselor.

3

**B. The Victim's Mother**

Kelly, who was divorced from Allison's father, testified that she moved in with Lumsden in November 2014. On the evening of March 10, 2015,[3] Kelly had a kidney infection, took a muscle relaxer, and went to bed.

When Kelly went downstairs the next morning, she found Allison asleep on the couch. Kelly testified that finding Allison on the couch was unusual because she had her own bedroom.

Kelly sat down next to Allison on the couch, rubbed her back, and told her that it was time to wake up. Kelly said that Allison opened her eyes "really big" like she was "startled almost," looked at Kelly, and said she was really tired. Kelly asked Allison why she was tired, and she said, "Ray and I had a lot of fun last night." When Kelly asked what they did, Allison replied that it was a secret. Kelly told Allison that she was not to keep secrets from her. Allison said that she could tell Kelly one thing—that she and Lumsden had eaten Jell-O and cookies even though Allison knew that Kelly did not like her to have sugar at night. Kelly told her that it was sometimes okay to have sugar at night.

Kelly asked what Allison and Lumsden had done. At that point, Allison's demeanor completely changed. Kelly explained that Allison "tightened up. She looked down. She looked scared. Something was wrong." Kelly testified that she

[3]Based on other testimony, it appears that the date was March 9, 2015, but we set forth the date Kelly gave during her testimony.

4

had never seen Allison act like that. Allison said that she could not tell Kelly the other secret because Lumsden had told her "never ever to tell" and that Kelly would be mad. Kelly then asked Allison, "Did he touch you?" Allison said, "Yes, in two places," and she held up her fingers. Allison told Kelly that Lumsden had touched her "privates" and her bum, and she pointed down whenever she said privates. Kelly asked Allison whether Lumsden had touched her inside or outside her panties, and she said inside. Allison told Kelly that Lumsden had inserted his finger inside her privates and her bum, that he asked her if she liked it, that she said no, and that he said that was what mommy likes. Kelly told Allison, "Baby, you know that wasn't right. You know that was wrong. Right?" Allison said, "[Y]eah." Kelly asked Allison if she had touched Lumsden, and Allison replied, "He asked me if I wanted to, but I said no." Kelly picked up Allison and told her that she was proud of her for telling her what had happened and that they were going to talk to some other adults they could trust.

Once they were in the car, Kelly called 911, and the 911 operator guided her to the sheriff's office. Kelly spoke briefly to two police officers at the Denton County Sheriff's Office. Then, she followed a police officer to the hospital. Kelly testified that she was in the room when a sexual assault nurse examiner (SANE) examined Allison.

While they were at the hospital, Kelly received text messages from Lumsden. She "was really angry" and sent him a text that asked how he could have done this.

5

Lumsden "was really mad" and responded that Allison had blamed her grandpa[4] and her father[5] for "the same things," that she could not be trusted, and that she needed help. Kelly testified that Allison had never told her that her grandpa or her father had touched her inappropriately and that she (Kelly) did not believe Lumsden's texts.

The following day, Allison's father took her to the Children's Advocacy Center, and Kelly met them there. Kelly moved out of Lumsden's house.

## C. The Victim's Half-Brother

Kelly's son David testified that his mother had previously dated Lumsden, and David identified Lumsden in the courtroom. David said that on the night in question, he was at Lumsden's house with Kelly, Lumsden, and Allison. David testified that he had school the next day but that Allison did not because she attended school in a

---

[4]Kelly explained that about six weeks prior to the incident, Lumsden had told her in the kitchen one day that Allison had told him "something kind of weird" about a time when her grandpa was tickling her and her panties accidentally showed; she said, "[W]hoops, my panties are showing"; and her grandpa said that was okay. Kelly testified that Lumsden's story "was really weird" to her because Allison never wore dresses without leggings or shorts underneath and so her panties would not have shown. Lumsden was upset and wanted her to be upset and to call CPS, but Kelly told him that she would talk to Allison about the incident even though she was "sure it's nothing." When Kelly asked Allison if her grandpa had ever made her feel uncomfortable, she had nothing to say other than that he is silly.

[5]Kelly testified that one night—a couple of weeks before the incident—when she was giving Allison a bath, Lumsden had questioned her about who bathed Allison at her father's house. Kelly told him that Allison washes herself but that her father probably helped her with her hair. Kelly testified that Lumsden was bothered by this and said that it was inappropriate. Kelly told Lumsden that she would work with Allison on washing her own hair. After Kelly spoke with Allison, Kelly did not think that Allison's father was doing anything inappropriate.

6

different school district. David recalled that Lumsden had given Kelly some medicine because she was not feeling well and that she went to bed. David testified that he, Allison, and Lumsden had watched television for a while but that he had gone to bed about 9:30. David heard Lumsden tell Allison that she could stay up as long as she wanted because she did not have school the next day. When David went to bed, Allison and Lumsden were sitting next to each other on the couch.

The next morning when David went downstairs to eat breakfast, he saw Allison sleeping on the couch with a blanket over her. When he left for school, Allison was still asleep.

While David was at school, the receptionist notified him that his mom was going to be late because she was at the hospital. When Kelly eventually picked up David, they went to Lumsden's house, and he packed a bag. After they left, Kelly received a call, and they returned to Lumsden's house, which had police cars everywhere. David said that they went to a shelter that night. David did not recall Allison ever telling him about her grandpa or her father touching her inappropriately.

**D. Denton County Sheriff Deputies Gilberto Velo and Maurice Floyd (the deputies)**[6]

Deputy Gilberto Velo with the Denton County Sheriff's Office testified that he and Deputy Maurice Floyd were dispatched to the patrol office on the morning of

---

[6]Because the two deputies worked together and provided similar testimony, we summarize their testimony together.

March 10, 2015, in response to a sexual assault call report.  The deputies spoke with

Kelly, who appeared to be shocked and in disbelief as she was talking.  Deputy Velo

said that Kelly teared up as she explained what Allison had told her had occurred the

night before.

> Deputy Floyd recalled that Kelly
>
> began to unfold to us verbally what her daughter stated to her about secrets, plural, and her comment as I recall, she says, well, honey, you know, momma has always told you we don't keep secrets.  And then her mother said, well, I need to know what those secrets are.  And from what I call -- recall, she stated that her daughter stated to her that the secrets involved Jell[-O], that she would be rewarded, so to speak, Jell[-O] for, number one, keeping quiet about what the secret was about and then, number two, the mother began to elaborate on the fact that she had been touched in a -- her private area and that she wasn't -- she had been told, now, don't tell anybody.  Don't say anything to mommy about this because basically momma does -- does this too to me, that being the actor.

Neither Deputy Velo nor Deputy Floyd interviewed Allison that day.  Allison

was not in the room while the deputies spoke with Kelly.  Afterwards, Deputy Floyd

spoke with one of the investigators, who advised him that Allison needed to be seen

by a SANE at Denton Regional Medical Center.

Kelly and Allison then followed the deputies to Denton Regional Medical

Center.  The deputies contacted Child Protective Services to make them aware of the

report they had taken.  Once the investigators arrived at the hospital, the deputies left.

## E. Investigator John Schofield

John Schofield, an investigator with the Denton County Sheriff's Office, testified that he went to Denton Regional Medical Center on March 10, 2015, and obtained a box from a SANE and placed it in evidence at the sheriff's office. Later that evening, Schofield assisted warrant deputies by watching for Lumsden's vehicle because a warrant had been issued for his arrest. Schofield spotted the vehicle and went toward the area where Lumsden's residence was located but was alerted that he had been arrested.

## F. The SANE

Nurse Julie Carriker, a registered nurse who worked part-time as a SANE for Denton County, testified that when she spoke with Allison at Denton Regional Medical Center, the first thing she asked her was if she knew why she was there. Nurse Carriker testified that Allison told her the following:

> So she told me that Ray touched her private part or her privates. She said that he did it all the time. She said that she didn't know why, but that it had happened again the previous night. And she told me that she was in the living room, that he had turned the TV off[,] and [that] he [had] touched her kidney parts was what she called it. And so I said, can you point to where that is? And she pointed to her vaginal area.
>
> Then she said the second time that he touched her, he touched her butt[,] and he put his hands in her pajamas. And she would say that he swirled his hand around, and she said[,] "Here," and then she pointed again to that -- to the vaginal area.
>
> She said that he kept pushing his finger into her butt and that he always swirled it around and it hurt her. She also said that he touched his pee part, and she pointed to the area -- the groin area. And she said

9

he was swirling his pee part around playing with it. She mentioned that he kissed her on the lips, and she said that he does it all the time and that he wanted her to touch his private parts but she said no.

After obtaining Allison's history, Nurse Carriker performed a head-to-toe exam of Allison, looking for any signs of trauma. Nurse Carriker testified that she performed Allison's physical exam at 2:00 p.m. on March 11, 2015,[7] which was approximately fourteen hours after the incident. Nurse Carriker explained that during the exam, she noted "generalized redness" that covered Allison's vaginal area and a tear or a cut "barely inside the anal opening at about 7:00." Nurse Carriker testified that the redness on Allison's vagina was consistent with Allison's statement that Lumsden had put his finger there and had swirled it around. Nurse Carriker documented in her report that Allison's anus dilated quickly, and she explained that she sees that "in abuse cases." Nurse Carriker testified that the tear in Allison's anus was consistent with Allison's statement that Lumsden had inserted his finger in her bottom. Allison told Nurse Carriker that the tear in her anus bothered her. Nurse Carriker swabbed Allison's mouth, vagina, anus, and fingernail area and combed through her hair to collect biological evidence.

## G. The Forensic Interviewer

Priscilla Alvarado, who serves as a family services coordinator at the Children's Advocacy Center for Denton County, testified that during her forensic interview with

---

[7]Based on other testimony, it appears that the date was March 10, 2015, but we set forth the date Nurse Carriker gave during her testimony.

Allison on March 11, 2015, she said that her mom's boyfriend Lumsden had "done this to her." Alvarado testified that Allison provided sensory details and peripheral details when she explained what had happened to her. The video of the forensic interview was played for the jury.

During the forensic interview, Allison said that she was seven years old and that she was there because "my friend Ray [whom she identified as her mother's boyfriend] keeps touching my privates, and I don't know why." Allison told Alvarado that Lumsden had touched her more than one time, that she could not remember the first time, but that it had occurred when she was seven years old. Allison later told Alvarado that Lumsden had touched her four times, that one time he only touched her pee part, and that the other times "were kind of like the same thing."

Allison told Alvarado about a recent touching. Allison said that after she took a bath, she went downstairs to be with Lumsden. She said that she was wearing her Monkey Junior pajamas and rainbow panties and that Lumsden was wearing a dark blue shirt and gray pants. After her half-brother David went to bed, she went upstairs to grab toys and a pillow so that she could sleep on the couch. Allison said that Lumsden was sitting at the very end of the couch and that she was laying on him on her back "to get really cozy." Allison explained that it was midnight and that Lumsden touched her "privates," which she explained was her term for the body parts that she used to go to the bathroom. Allison said that Lumsden touched her under her clothes with his fingers and that he was "wobbling" and kept "wiggling" his

11

fingers. Allison told Alvarado that Lumsden had put his finger in her butt "really, really deep" and that it had made her feel "weird" and "disgusting" and "embarrassed." Allison said that she told Lumsden to stop. Allison said that Lumsden asked her to touch his pee part, but she told him no. Allison told Alvarado that Lumsden "tells me he always touches [Mom's] butt and pee spot." Allison said that Lumsden also told her not to tell anyone and specifically not to tell her mother. Lumsden then gave her red Jell-O, which she said was her favorite. Allison told Alvarado that this kind of touching had not happened with anyone else before.

## H. Lumsden's Son's Friend

Elliott, who was in eighth grade, testified that he was friends with Lumsden's son John. After Lumsden bonded out of jail on these offenses, Elliott received a call from a man named Troy who lived at Lumsden's house and was allegedly John's uncle. Troy told Elliott to tell John that "if they ever asked questions," he should say that when Allison was in the kitchen doing cartwheels, her "grandpa was doing stuff that he shouldn't have been doing."

## I. Investigator Ashleigh Berg

Ashleigh Berg, an investigator with the Denton County Sheriff's Office, testified that she went to Lumsden's residence on March 10, 2015, to execute a search warrant. Berg found blankets and a pillow on the couch, which looked like it "was made up into a bed," and were consistent with Allison's statement. Berg also found an empty serving cup of Jell-O on the top of the trash can in the pantry in the kitchen

and the pull-off lid was on the countertop in the kitchen, which she testified was consistent with Allison's statement. Berg photographed the Jell-O container and the couch. Lumsden was at the residence during the search and gave Berg permission to take photographs of text messages on his phone.

### J. Investigator Marco Deleon

Marco Deleon, who previously worked in criminal investigations with the Denton County Sheriff's Office, testified that on March 10, 2015, he met with Kelly when she brought Allison to the sheriff's office. Deleon described Kelly as "very distraught, very self-blaming." After hearing Kelly describe what had happened to Allison, Deleon made the decision that they should move forward immediately with a sexual assault exam by a SANE at the hospital because he estimated that only twelve to fourteen hours had passed since the alleged sexual assault had occurred.

Deleon testified that afterwards, he met with Nurse Carriker and reviewed her report, which indicated that Allison had a tear in her anus that was consistent with a fingernail; that her anus dilated very quickly, indicating that it had been recently penetrated; and that she had redness in her vaginal area. Based on Nurse Carriker's findings during Allison's physical exam, Deleon obtained an arrest warrant for Lumsden, which was executed at his residence when he arrived home from work.

Upon arrest, Lumsden wanted Deleon to look at the text messages between him and Kelly. Deleon described Lumsden's text messages to Kelly as setting the stage to show that someone else was responsible for the sexual assault of Allison.

During the search of Lumsden's residence, Lumsden pointed out some legal paperwork that he felt was relevant to show that he was not responsible. Deleon collected the paperwork but did not find Lumsden's defense to be valid. Deleon testified that when he looked into Lumsden's statements that Allison's grandpa or her father had inappropriately touched her, Deleon found that Lumsden was the root of those statements.

Deleon testified that the day following Lumsden's arrest, he (Deleon) watched Allison's forensic interview from a room that was adjoined to the interview room. Deleon said that Allison provided "a lot of details" that they did not know when they executed the search warrant on Lumsden's home. Deleon said that Allison described the clothing she had on during the sexual assault—monkey pajamas and rainbow panties—and the color of the pants and shirt that Lumsden had been wearing. Deleon said that Allison described laying on the sofa with Lumsden and getting cozy with him before the sexual assault occurred. Deleon testified that the statements Allison made during the forensic interview were corroborated by the evidence found at Lumsden's residence and by the findings of the sexual assault examination. Deleon took buccal swabs of Lumsden's mouth to obtain his DNA.

Deleon spoke with Kelly again after Allison's forensic interview. Kelly told Deleon about the background of Lumsden's relationship toward children, which reflected preplanning and grooming. Kelly also gave Deleon a box of items.

14

During the investigation, Kelly told Deleon that she was concerned about a blog called Topics that discussed Kelly and Allison and mentioned paying Kelly some money to make the case go away and to prevent Allison from having to testify in court. Deleon traced several of the usernames that posted about Kelly and Allison and built up Lumsden's character back to a single source—Lumsden's cell phone.

Also during the investigation, Deleon was made aware that people were receiving phone calls that were trying to interfere with the investigation. Troy told Deleon that Lumsden was using his (Troy's) name and calling people. Troy was ultimately ruled out as the person who was making the phone calls.

## K. Lumsden's Son

John, who is Lumsden's son, testified that he was not at his dad's house when the events at issue transpired. John said that Allison never told him anything about her grandpa or her father touching her inappropriately. John testified that Allison never touched him inappropriately.

## L. Forensic DNA Analyst

Christina Capt, who is a technical leader and a forensic DNA analyst with the University of North Texas Center for Human Identification, testified that the vaginal swabs that had been taken from Allison were used to develop an unknown Y STR profile. The buccal swabs from Lumsden were used to develop a known Y STR profile. Capt explained that the profile developed for Lumsden was compared to the profile from Allison's vaginal swab, and "at all nine locations where we obtained data

15

for the vaginal swab, there was an exact match with the alleles detected in Raymond Lumsden's profile." Capt testified that she was thus not able to exclude Lumsden from being a contributor to the unknown Y STR profile found in Allison's vaginal swabs. Capt further testified that six out of 10,000 people would have the same nine markers that were located in this case and that no other male contributors were detected on any of the items that were tested.

## M. Lumsden

Lumsden took the stand during the defense's case in chief. Lumsden testified that when he was sixteen years old, he was convicted of fifth-degree burglary in Minnesota and was sentenced to adult prison. While Lumsden was in prison, he saw Troy, whom he had seen before at family get-togethers and understood that he was a relative. Lumsden later learned from his mother that Troy was a cousin on his father's side.[8] Lumsden said that Troy protected him while he was in prison. Because Lumsden felt a debt of gratitude toward Troy, Lumsden housed and fed him once they were released from prison.

Lumsden testified that due to the kids being home for spring break and Kelly being sick, he had asked Troy to come help out with his kids. Lumsden said that on the night in question, Kelly was in bed when he came home from work, Allison was

---

[8]Lumsden's ex-wife Amanda testified that Troy was not related to Lumsden in any way and that he was simply a friend.

watching television, and David was playing video games. Lumsden testified that he gave Allison red Jell-O between 8:00 and 9:00 p.m.

Lumsden went upstairs and put on a pair of gray sweatpants and a blue shirt. Lumsden said that when he came downstairs, he finished some work and then sat on the couch and watched television with Allison. Lumsden testified that David went to bed about 10:15 p.m. and that he went to bed around 10:30 p.m. after locking the front door and setting the alarm. Lumsden agreed that he was alone on the couch with Allison for a period of time.

Lumsden said that when he went upstairs to go to bed, Allison was already asleep on the couch. He woke up Kelly and told her that Allison was sleeping on the couch downstairs, and Kelly said that Allison was supposed to be sleeping in her own room. Lumsden said that Kelly went downstairs and dealt with Allison around 10:45 or 11:00 p.m. Lumsden testified that he did not go downstairs in the middle of the night and assault Allison.

When Lumsden went downstairs the next morning, Allison was sitting on the couch eating cereal that David had prepared for her. Lumsden said that he and Kelly had a very explosive fight that morning and that Allison was crying when he left for work. When Kelly sent Lumsden text messages later that morning accusing him of sexually assaulting Allison, he knew that he had not sexually assaulted Allison and told Kelly that she needed to look at Allison's grandpa and father as possible suspects.

17

Lumsden also considered the possibility that Troy could have been a suspect but did not know if he would do something like that. Lumsden said that Troy had a set of keys to the house and had previously stayed in the room that Allison used as her bedroom. Lumsden testified that it was possible that Troy came in the middle of the night, tried to sleep on the couch, assaulted Allison, and then left. Lumsden testified that the only thing Allison had ever said about Troy was that he had tickled her; Lumsden had never heard any allegations about Troy.

Lumsden admitted that he could not explain the DNA evidence. Lumsden testified that his son John did not sexually assault Allison and that none of his other patrilineal relatives were in his home on the night in question.

Lumsden gave a statement to Deleon when he was arrested. When confronted with the statement he gave at that time, which said that Kelly was sick downstairs with Allison and David when he got home from work around 9:00 p.m., Lumsden said it was possible that he had previously said that. Lumsden did not recall telling Deleon that Kelly went to bed fifteen minutes before Lumsden went to bed.

Lumsden recalled that he had given a statement to someone at Child Protective Services. The prosecutor recounted that Lumsden had told CPS that Kelly was in bed when he got home at 9:00; that she got out of bed, ate, and was groggy; that he and David went to bed; and that Allison was downstairs on the couch. Lumsden testified that was the exact same thing that he had told Deleon, except the fact that she got up and ate. Lumsden testified that he did not really know what he had told Deleon

18

because he had guns pointed at his face, but he recalled telling Deleon specifically that Kelly was in bed when he got home and that she had been in bed all day because she was sick and taking pills that had been prescribed to her.

When confronted with the letter that he had written to his ex-wife Lindsey, whom he had told that he and David had gone upstairs together at 10:30 p.m. on the night in question, Lumsden explained that there was maybe a fifteen-minute gap between the time that he and David went to bed that night.

Lumsden agreed that in the statements he had made to Deleon, the CPS worker, and Lindsey, he had said that at some point, there was a room full of people—including John, David, Elliott, and Kelly—and that Allison had made allegations against her grandpa and her father. When confronted with David, Elliott, and John's trial testimony that Allison had never made that allegation, Lumsden said that maybe they did not hear her say it or did not remember that she had said it.

On cross-examination, Lumsden did not contest the fact that Allison had been sexually assaulted on or about March 10, 2015; that the only people in his home on the night in question were Kelly, Allison, David, and Lumsden; and that there was no testimony that Troy was anywhere near Lumsden's home on the night in question.

**N.  Rebuttal Witnesses**

During rebuttal, the State called three of Lumsden's ex-wives, his daughter Anna, Kelly, an employee of the Denton probation department, Deleon, and a Flower Mound police officer—all of whom expressed their opinions that Lumsden was untruthful.

### III.  Sufficiency of the Evidence

In his first issue, Lumsden argues that the evidence is insufficient to support his conviction for criminal solicitation of a minor.

**A.  Standard of Review**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016).  Thus, when performing an evidentiary sufficiency review, we

may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

## B. Applicable Law

As applicable in this case, a person commits the offense of criminal solicitation of a minor if, with intent that indecency with a child be committed, he requests, commands, or attempts to induce a minor to engage in specific conduct that, under the circumstances surrounding the actor's conduct as the actor believed them to be, would constitute indecency with a child. Tex. Penal Code Ann. §§ 15.031(a), 21.11(a). However, a person may not be convicted of criminal solicitation of a minor on the uncorroborated testimony of the minor allegedly solicited "unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the minor act on the solicitation." *Id.* § 15.031(c).

The corroboration required under the criminal solicitation statute is analogous to the corroboration requirement found in the accomplice-witness statute. *Compare id.*, *with* Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005); *see Richardson v. State*,

700 S.W.2d 591, 594 (Tex. Crim. App. 1985). Due to the similarities between these two statutes, the test for evaluating the sufficiency of the corroboration evidence is the same under each. *Richardson*, 700 S.W.2d at 594. In assessing the sufficiency of the evidence corroborating the victim's testimony, the test requires that we eliminate the minor victim's testimony from consideration and then determine whether there is other incriminating evidence tending to connect the accused with the crime. *Id.* The tends-to-connect standard presents a low hurdle for the State because the evidence need not directly link the accused with the crime or be sufficient in itself to establish guilt. *See Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008), *cert. denied*, 556 U.S. 1211 (2009); *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996).

## C. Analysis

Here, eliminating Allison's testimony from consideration, we conclude that the State presented other evidence that tends to connect Lumsden with the offense of criminal solicitation of a minor. Kelly noted unusual behavior and a change in Allison's demeanor when she awoke her the morning after the sexual assault. Kelly testified that when she asked Allison if she had touched Lumsden, Allison replied, "He asked me if I wanted to, but I said no." Similarly, Nurse Carriker testified that Allison told her that Lumsden wanted her to touch his private parts, but she said no. And during the forensic interview, Allison said that Lumsden had asked her to touch his pee part, but she told him no.

22

Additionally, Lumsden's description of what he was wearing on the night in question matched the description that Allison had given during her forensic interview. Lumsden admitted that he had given Allison red Jell-O, and the search of Lumsden's residence revealed an empty single-serving carton of Jell-O in the trash, as well as a pillow and a blanket on the couch where Allison had slept. Lumsden's testimony, as well as David's testimony, demonstrated that there was a period of time when Lumsden was alone with Allison on the couch after David went to bed.

As the sole judge of the weight and credibility of the evidence, the jury had before it testimony from multiple individuals that Lumsden was not truthful; similarly, the jury had before it evidence that Allison was credible because her allegations of penetration by Lumsden had been corroborated with physical findings during the sexual assault examination and DNA evidence. Moreover, the testimony from Kelly, Nurse Carriker, David, Lumsden, and the investigators who searched Lumsden's residence, as well as the video of the forensic interview, tends to connect Lumsden with criminal solicitation of Allison, who was a minor. Viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found beyond a reasonable doubt that Lumsden solicited Allison, a minor. *See Thompson v. State*, No. 07-12-00454-CR, 2014 WL 4807581, at *4 (Tex. App.—Amarillo Sept. 19, 2014, pet. ref'd) (mem. op., not designated for publication) (holding that testimony of appellant, victim's sister, nurse examiner, and recorded conversation constituted sufficient evidence tending to connect appellant with criminal solicitation

23

of R.S., a minor); *Lankford v. State*, 255 S.W.3d 275, 277 (Tex. App.—Waco 2008, pet. ref'd) (holding that testimony from multiple witnesses, including appellant, corroborated the solicitation).[9] We overrule Lumsden's first issue.

## IV. Motion to Suppress

In his second issue, Lumsden argues that the trial court reversibly erred by denying his motion to suppress evidence alleged as DNA.

### A. Standard of Review

When reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the

---

[9]Lumsden argues that public policy considerations weigh strongly against holding that a minor complainant's own hearsay, as relayed through the testimony of other witnesses, can "corroborate" her in-court testimony for purposes of section 15.031. Because the law interpreting section 15.031's corroboration requirement is clearly established and permits the use of a victim's statements to others, we decline to overturn it on the public policy grounds advanced by Lumsden. *See, e.g.*, *Thompson*, 2014 WL 4807581, at *4 (utilizing statements victim made to her sister and to nurse examiner to corroborate solicitation offense); *Cortez v. State*, No. 13-05-00447-CR, 2006 WL 1875465, at *2 (Tex. App.—Corpus Christi July 6, 2006, pet. ref'd) (mem. op., not designated for publication) (utilizing statements victim made to his parents to corroborate offense of solicitation).

24

trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

## B. Applicable Law

Rule of evidence 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence. Tex. R. Evid. 403. In a proper rule 403 analysis, the trial court must balance the inherent probative force of the proffered item of evidence, along with the proponent's need for that evidence, against (1) any tendency of the evidence to suggest decision on an improper basis, (2) any tendency of the evidence to confuse or distract the jury from the main issues, (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The Texas Court of Criminal Appeals has cautioned that in reviewing the trial court's rule 403 balancing determination, we are to "reverse the trial court's judgment 'rarely and only after a clear abuse of discretion.'" *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).

## C. What the Record Shows

The trial court held a pretrial hearing on Lumsden's motion to suppress evidence alleged as DNA. The trial court asked for clarification on the basis for Lumsden's motion, and he agreed that he was arguing under rule 403 that the DNA evidence would be unfairly prejudicial to him because "it identifies Mr. Lumsden and any of his male heirs."

Capt, the State's DNA expert who testified at trial, also testified at the pretrial hearing. Capt testified that the swabs taken from Allison had been compared to the DNA samples from Lumsden for Y chromosome STR markers and that nine of seventeen alleles were found. Capt recognized that those nine alleles would also match Lumsden's male heirs. Capt testified that using the DNA printout scale, evidence of only one male was detected in Allison's sample. On cross-examination, Capt testified that 0.06% of the population would share the Y STR markers in their partrilineal lineage.

> The trial court stated its conclusion on the record:
>
> In regards to the objection under 403, while I understand that certainly it could be a valid argument that there's someone else in Mr. Lumsden's line or his heirs on his male side, I do believe that that would be proper cross-examination or proper argument. But in regards to whether or not I would exclude the evidence because the probative value substantially is outweighed by the danger from any type of unfair prejudice or confusing the issues or anything of that nature, I can't find that it would violate 403 and would simply overrule the grounds based upon that.

The trial court also signed an order denying Lumsden's motion to suppress.

## D. Analysis

Considering the first factor in the 403 analysis, the probative value of the DNA evidence is high. Lumsden's defensive theory at trial was that because Allison was asleep and because it was dark, she did not see her attacker, whom he claimed was Troy. Because Allison described being alone with Lumsden, her credibility was central to the State's case. The DNA evidence—showing that the DNA found in the swab from Lumsden matched nine of seventeen alleles in Allison's vaginal swab and that only one male was detected as the contributor for the Y STR in Allison's vaginal swab—corroborated Allison's testimony and was therefore probative of Lumsden's guilt. Lumsden's argument—that the probative value of the DNA evidence is minimal because it could not be positively matched only to Lumsden but could match with any male in his patrilineal lineage—is not persuasive; the evidence showed that no other male relative of Lumsden's was in the house on the night in question and that Lumsden affirmatively testified that his son John did not sexually assault Allison. The probative value of the DNA evidence was therefore anything but minimal.

With regard to the second factor, although the DNA evidence in this case is certainly prejudicial, it is not unfairly prejudicial because it provides circumstantial proof of at least one of the charged offenses. *See Dossett v. State*, 216 S.W.3d 7, 22 (Tex. App.—San Antonio 2006, pet. ref'd) ("The prejudicial nature of the DNA evidence was no higher than other inculpatory scientific evidence[] and was not

27

*unfairly* prejudicial."). Under these circumstances, the DNA evidence presented was not such that it would tempt the jury to come to irrational conclusions.

The third factor—the time needed to develop the evidence—does not weigh in favor of Lumsden. The trial transcript demonstrates that Capt's testimony, including cross-examination by Lumsden, spanned only thirty-one pages of the over 600 pages of the guilt-innocence phase of the trial. In its opening statement, the State briefly mentioned that the SANE had obtained vaginal and anal swabs from Allison and later told the jury that Capt would testify that "she cannot exclude Ray Lumsden or any patrilineal relatives, meaning Ray Lumsden or his dad or his son." Lumsden argues on appeal that the State did not qualify its argument in rebuttal to say that the DNA belonged to Lumsden "or . . . a patrilineal relative" but instead stated that the DNA belonged to Lumsden. Lumsden did not object to that statement, nor would an objection have been sustained because it was a proper summation of what the evidence at trial had shown—that Lumsden's son John did not commit the sexual assault of Allison and that no patrilineal relative of Lumsden's was in the home on the night in question. Moreover, because the DNA evidence linked Lumsden to Allison in a manner consistent with her testimony, the jury would not have been distracted from the indicted offense.

With regard to the final factor—the State's need for the evidence—the court of criminal appeals has held that a proponent's need for evidence is great when there is a disputed issue and the proponent has no other evidence to prove the fact at issue. *See*

28

*Manning v. State*, 114 S.W.3d 922, 928 (Tex. Crim. App. 2003). That is the situation here. Troy did not testify at trial, so there was no way to disprove Lumsden's defensive theory that Troy came during the middle of the night, sexually assaulted Allison, and left before anyone awakened in the morning. But the discovery of DNA from Lumsden in the vaginal swabs taken from Allison disputes his theory. Thus, the State's need for the DNA evidence is great.

Because the four factors weigh in favor of admission of the DNA evidence and because the probative value of the DNA evidence was not substantially outweighed by the danger of unfair prejudice, we hold that the trial court did not abuse its discretion by admitting the DNA evidence. *See Dossett*, 216 S.W.3d at 22 (holding that trial court did not abuse its discretion by finding that the probative value of DNA evidence was not substantially outweighed by the danger of unfair prejudice); *Jean v. State*, No. AP-76,601, 2013 WL 3282956, at *8 (Tex. Crim. App. June 26, 2013) (not designated for publication) (holding that although DNA evidence did take some time to develop due to its complexity, "that factor is more than outweighed by the others"), *cert. denied*, 571 U.S. 1166 (2014); *Rivera v. State*, No. 03-04-00235-CR, 2005 WL 1240705, at *4 (Tex. App.—Austin May 26, 2005, no pet.) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion by admitting DNA evidence because all four factors weighed in favor of admission). And because unfair prejudice under rule 403 was the sole basis of Lumsden's motion to suppress the DNA evidence, we further hold that the trial court did not err by

denying Lumsden's motion to suppress the evidence alleged as DNA. We overrule Lumsden's second issue.

## V. Expert Expenses

In his third issue, Lumsden argues that the trial court reversibly erred by refusing to give prior approval for expenses related to expert testimony that Lumsden incurred in the presentation of his defense.

## A. Applicable Law

In *Ake v. Oklahoma*, the United States Supreme Court held that due process may require that an indigent defendant be granted access to expert assistance if the expert can provide assistance which is "likely to be a significant factor at trial." *Ex parte Jimenez*, 364 S.W.3d 866, 876 (Tex. Crim. App. 2012) (citing *Ake*, 470 U.S. 68, 74, 105 S. Ct. 1087, 1091–92 (1985)), *cert. denied*, 568 U.S. 1085 (2013). Before an indigent defendant is entitled to appointment and payment by the State for expert assistance, he must make a pretrial "preliminary showing" that is based upon more "than undeveloped assertions that the requested assistance would be beneficial." *See id.* at 881 (citations omitted). Thus, in Texas, an indigent defendant will not be entitled to funding for experts absent adequate factual support in the written motion that he presents to the trial judge. *Id.*

A trial judge does not err by denying an informal, off-the-record request for additional funding for experts when he is not presented with a written motion that contains affidavits or other evidence that would support the defendant's request. *Id.*

at 882. Moreover, we cannot review the merits of an *Ake* claim if the defendant failed to file a proper pretrial motion that the trial judge denied. *Id.*

## B. What the Record Shows

In July 2016, Lumsden filed a motion for approval of funds for experts and requested $6,000. The trial court approved $3,000 for the services of experts without prejudice to additional requests if necessary. Although Lumsden filed motions after this requesting funds for investigators, he did not file any other written motions requesting funds for expert witnesses.

At the pretrial hearing on September 2, 2016, Lumsden made an oral request for the trial court to grant an additional $1,500 for a DNA expert to travel from California to be present at the trial. When the trial court inquired whether there were any experts that Lumsden could hire from Texas to avoid an additional out-of-state fee, Lumsden's counsel responded that there were "plenty of experts I could have hired" but that Lumsden had "specifically demanded that we hire this specific expert from California." The trial court stated that it was not going to make a dispositive ruling on Lumsden's oral motion but would take the matter under advisement. The record does not show that the trial court ever ruled on Lumsden's oral request for expert funds.

The clerk's record contains a handwritten letter addressed to the judge and dated September 14, 2016,[10] but filed September 23, 2016.[11] In the letter, Lumsden states that his attorney "refuses to enter the DNA report of our court[-]approved expert, and he failed to have her here to testify. . . . Being indigent, I needed her here, but my lawyer said that <u>you</u> repeatedly denied providing funds to her travel expenses!?" Lumsden also raised this issue in his motion for new trial.

## C. Analysis

Here, the record demonstrates that Lumsden did not file a proper pretrial motion with the appropriate affidavits or other evidence supporting his request for funding to pay for a DNA expert. Lumsden has thus forfeited consideration of his *Ake* claim on appeal by failing to file a proper written *Ake* motion in the trial court. *See id.* (holding that applicant forfeited consideration of her *Ake* claim by failing to file a proper written *Ake* motion and ensuring that the trial judge formally ruled on it).[12] Accordingly, we overrule Lumsden's third issue.

---

[10]This date falls in the middle of the guilt-innocence phase, which began on September 13, 2016, and completed on September 15, 2016.

[11]The punishment phase concluded on September 19, 2016.

[12]Because Lumsden did not file a pretrial written motion with the requisite affidavits, we need not address whether his statements in his letter that was filed after the trial concluded and in his motion for new trial—that the trial court had denied his request for expert funding—constitute a ruling on Lumsden's oral motion. *See* Tex. R. App. P. 47.1 (requiring appellate court to address only issues necessary to disposition of appeal).

## VI. Evidentiary Challenges

In his fourth through tenth issues and in his twelfth issue, Lumsden challenges the trial court's rulings on objections to various testimony and to the admission of State's Exhibit Nos. 4, 13, and 30. Because these issues challenge evidentiary rulings, we set forth the applicable standard of review only once and refer to it, as necessary, in our analysis of each of these issues.

### A. Standard of Review

We review a trial court's evidentiary rulings under an abuse-of-discretion standard. *See Jenkins*, 493 S.W.3d at 607. A trial judge's decision is an abuse of discretion only when it falls outside the zone of reasonable disagreement. *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App.), *cert. denied*, 549 U.S. 1024 (2006).

If we find error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex. R. App. P. 44.2. If the error is constitutional, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. Tex. R. App. P. 44.2(a). Otherwise, we apply rule 44.2(b) and disregard the error if it did not affect appellant's substantial rights. Tex. R. App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

33

A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). In making this determination, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

## B. Admission of Outcry Statements

In his fourth issue, Lumsden argues that the trial court reversibly erred by admitting Allison's outcry statements through the testimony of her mother. Lumsden contends that the outcry statements constitute hearsay and do not fall within the purview of article 38.072.

## 1. Applicable Law

Hearsay is generally inadmissible. *See* Tex. R. Evid. 802. But Texas Code of Criminal Procedure article 38.072 provides, in relevant part, that a statement is not inadmissible on the basis that it is hearsay if (1) the statement describes an offense under chapter twenty-one of the penal code that a defendant committed against a

34

child younger than fourteen years of age; (2) the statement was made by the child to

the first person who was eighteen years old or older, other than the defendant, that

the child spoke to about the offense; and (3) the "trial court finds, in a hearing

conducted outside the presence of the jury, that the statement is reliable based on the

time, content, and circumstances of the statement." Tex. Code Crim. Proc. Ann. art.

38.072, §§ 1(1), 2 (West Supp. 2018). Indicia of reliability that a trial court may

consider include:

> (1) whether the child victim testifies at trial and admits making the out-of-court statement[;] (2) whether the child understands the need to tell the truth and has the ability to observe, recollect, and narrate[;] (3) whether other evidence corroborates the statement[;] (4) whether the child made the statement spontaneously in his own terminology or whether evidence exists of prior prompting or manipulation by adults[;] (5) whether the child's statement is clear and unambiguous and rises to the needed level of certainty[;] (6) whether the statement is consistent with other evidence[;] (7) whether the statement describes an event that a child of the victim's age could not be expected to fabricate[;] (8) whether the child behaves abnormally after the contact[;] (9) whether the child has a motive to fabricate the statement[;] (10) whether the child expects punishment because of reporting the conduct[;] and (11) whether the accused had the opportunity to commit the offense.

*Gonzales v. State*, 477 S.W.3d 475, 479 (Tex. App.—Fort Worth 2015, pet. ref'd). With

regard to the fourth indicia of reliability, spontaneity is a consideration relevant to the

reliability of the outcry, but it is not a requirement for admissibility in and of itself. *See*

*Thomason v. State*, No. 07-97-00146-CR, 1998 WL 761883, at *7 (Tex. App.—Amarillo

Nov. 2, 1998, pet. ref'd) (not designated for publication).

## 2. Relevant Portion of the Record[13]

The record demonstrates that the trial court held a hearing outside the jury's presence on the admissibility of Allison's statement to her mother. Both Allison and Kelly testified during the outcry hearing.

Allison testified that her mother, who is over the age of eighteen, was the first person she told. Allison explained that when her mother came in to wake her up the morning after the incident, she told her mother that she and Lumsden had spent some time together the night before and that something was wrong. Allison said that her mother then asked if Lumsden had touched her privates.

Kelly testified at the hearing that on the night of the incident, she had a kidney infection, took a muscle relaxer, and went to bed early. When Kelly went downstairs the next morning, she saw that Allison was asleep on the couch, which was unusual because she never slept on the couch. Kelly woke up Allison and asked her if she felt okay. Allison said that she was really tired because she and Lumsden had stayed up really late the previous night and had a lot of fun. Kelly asked Allison what she and Lumsden had done the night before, and Allison said that it was a secret. Kelly told Allison that she should not keep secrets from her, and Allison confessed that she and

---

[13]Although some of the testimony set forth below is repetitive of the trial testimony set forth in the factual background at the outset of the opinion, we include it here to show what evidence was before the trial court at the outcry hearing.

36

Lumsden had eaten Jell-O and cookies even though she knew that Kelly did not like Allison to have sugar at night.

Kelly asked Allison what else they had done, and Allison said that was a big secret that she could not tell Kelly. Kelly said that Allison's demeanor completely changed and that "[s]he looked scared. She looked tightened up. She wasn't acting normal." Kelly asked Allison what the secret was and promised her that she would not be mad. Allison said that Lumsden had told her that she could never tell Kelly because she would be really mad. Kelly testified that Allison had a look on her face that she had never seen before. Because Kelly had "a really bad gut feeling that something was really wrong," she asked Allison if Lumsden had touched her. In response, Allison held up two fingers and said, "Two places." Allison pointed to her private areas and said, "My privates and my bum." Kelly asked whether the touching was on the inside or the outside of Allison's panties, and Allison said the inside. Allison said that Lumsden had put his fingers inside of her in two places and asked her if she liked it, and she said no.[14]

## 3. Analysis

Lumsden challenges only the fourth indicia of reliability set forth above, arguing that Allison's statements to her mother were not reliable because Allison "did

---

[14]When Kelly testified before the jury, she further testified that she had asked Allison if she had touched Lumsden. Kelly did not convey this during the outcry hearing, but the State had disclosed in its outcry notice that she would testify about Lumsden's requesting Allison to touch his penis.

not make the 'outcry' statement spontaneously in her own terminology but was responding to her mother's leading question." Although the testimony from the hearing outside the presence of the jury indicates that the outcry statement was not made spontaneously, Kelly's question to her daughter regarding whether Lumsden had touched her did not show that she prompted Allison as to the substance of the outcry. Allison's response provided the details about where and how Lumsden had touched her. There was no evidence in the record that Kelly had coached or had manipulated Allison into fabricating a statement about Lumsden. The undisputed evidence demonstrated that Lumsden had the opportunity to commit the offense related in the outcry statement while Kelly was in bed with a kidney infection. The circumstances surrounding the outcry—that Allison told Kelly during their initial conversation the following morning—indicate that the outcry was reliable.

Because spontaneity is not a requirement for admissibility in and of itself and because Lumsden does not challenge the other ten indicia of reliability, we conclude that Allison's outcry statement to her mother was sufficiently reliable to be admissible. *See Barker v. State*, No. 07-17-00024-CR, 2018 WL 3637262, at \*2–3 (Tex. App.—Amarillo July 31, 2018, pet. filed) (mem. op., not designated for publication) (concluding that outcry statement was reliable despite fact that statement was not spontaneous); *Davidson v. State*, 80 S.W.3d 132, 139 (Tex. App.—Texarkana 2002, pet. ref'd) (holding outcry statement was reliable despite fact that victim was prompted and encouraged to tell what secret she was keeping); *Thomason*, 1998 WL 761883, at

38

*7.  Accordingly, we hold that the trial court did not abuse its discretion by admitting Allison's outcry statement through Kelly, and we overrule Lumsden's fourth issue.

## C.  Admission of Allison's Statements Made to Nurse Carriker

In his fifth issue, Lumsden argues that the trial court reversibly erred by admitting hearsay statements that Allison made to Nurse Carriker.  Lumsden contends that Allison's statements to Nurse Carriker were not admissible as outcry statements under article 38.072 and were not admissible under the medical-diagnosis-or-treatment exception to the hearsay rule.

## 1.  Applicable Law

Under rule 803(4), a hearsay statement is admissible if the statement is made for—and is reasonably pertinent to—medical diagnosis or treatment and describes medical history; past or present symptoms or sensations; their inception; or their general cause.  Tex. R. Evid. 803(4).  To establish this exception, normally the proponent of the evidence must show that the out-of-court declarant was aware that the statements were made for purposes of medical diagnosis or treatment and that proper diagnosis or treatment depended upon the veracity of the statements.  *Taylor v. State*, 268 S.W.3d 571, 588–89 (Tex. Crim. App. 2008).  The proponent must also show that the statements are pertinent to diagnosis or treatment, i.e., that it was reasonable for the care provider to rely on the statements in diagnosing or treating the declarant.  *Id.* at 591.

The Texas Court of Criminal Appeals has observed that "it seems only natural to presume that adults, and even children of a sufficient age or apparent maturity, will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest." *Id.* at 589. Thus, the court of criminal appeals recognized "the almost universal tendency of courts under these circumstances to assay the record, not for evidence of such an awareness, but for any evidence that would *negate* such an awareness, even while recognizing that the burden is on the proponent of the hearsay to show that the [r]ule 803(4) exception applies." *Id.* The court of criminal appeals has therefore not required the proponent of statements to a SANE to affirmatively demonstrate that the declarant was aware of the purpose of the statements and the need for veracity. *See id.*; *Swofford v. State*, Nos. 12-14-00081-CR, 12-14-00082-CR, 2015 WL 7019762, at *3 (Tex. App.—Tyler Nov. 12, 2015, no pet.) (mem. op., not designated for publication);[15] *see also Franklin v. State*, 459 S.W.3d 670, 677 (Tex. App.—Texarkana 2015, pet. ref'd) ("[U]nlike statements made to non-medical professionals, which require affirmative evidence in the record on the issue of veracity, courts can infer from the record that the victim knew it was important to tell a [SANE] the truth in order to obtain medical treatment or diagnosis."); *Beheler v. State*, 3 S.W.3d 182, 188 (Tex. App.—Fort Worth 1999, pet.

---

[15]This court previously relied on *Swofford* in *Estes v. State*, 487 S.W.3d 737, 756 (Tex. App.—Fort Worth 2016), *rev'd on other grounds*, 546 S.W.3d 691 (Tex. Crim. App. 2018).

ref'd) ("[T]here is no requirement that a witness expressly state that the hearsay declarant recognized the need to be truthful in her statements for the medical[-] treatment exception to apply.").

## 2. Relevant Portion of the Record[16]

During the outcry hearing that was held outside the presence of the jury, Allison testified on cross-examination that she remembered going to a hospital or doctor's office but that she did not ask to go to the doctor's office. Defense counsel's cross-examination of Allison continued as follows:

> Q. You weren't -- you didn't have a broken arm or a broken leg. You have seen children that have broken arms or broken legs[,] and they go to a doctor and get a cast or something on them?
>
> A. Yes.
>
> Q. And so you know they've been hurt[,] and they go to a doctor to get well. You know that. Correct?
>
> A. Yes.
>
> Q. And sometimes when you're sick and you're throwing up, sometimes your parents take you to a doctor to get you medicine that you have to take to get well. Right?
>
> A. Yes.
>
> Q. And you would know if you were sick or hurt, wouldn't you?

---

[16]Like we did in issue four above, we set forth testimony from the outcry hearing even if it is repetitive of the trial testimony set forth in the factual background at the outset of the opinion to show what evidence was before the trial court at the outcry hearing.

A. Yes.

Q. So when your mom took you to this big medical building, were you asking to see a doctor or a nurse because you were sick or hurt?

A. No, I wasn't asking.

Q. Okay. You were asked several questions by a lady there. Do you remember that?

A. Yes.

Q. And you didn't know why they were asking you those questions, did you?

A. No.

Q. Because you weren't telling them you were hurt and needed medical attention or treatment or because you were sick or injured. Right?

[The State's objection was sustained.]

Q. (BY [DEFENSE COUNSEL]) I mean, you didn't tell your mom you were hurt and you needed to go see the doctor. Right?

A. I can't remember.

When the State questioned Allison on rebuttal about going to the hospital, she said she remembered talking to a nurse named Julie and telling her what Lumsden had done to her.

Nurse Carriker also testified at the hearing. Nurse Carriker testified that she had performed a sexual assault examination on seven-year-old Allison at Denton Regional Medical Center. When Nurse Carriker asked Allison why she was at the hospital, Allison said that she was there because Lumsden had touched her privates.

42

Allison said that Lumsden "always [did] it," that she did not know why, and that it had happened the previous night. Allison told Nurse Carriker that Lumsden had touched her "kidney parts," and she pointed to her vaginal area. Allison said that Lumsden had also touched her butt and had put his hands in her pajamas and had "swirled his hand around"; during this explanation, Allison kept pointing to her vaginal area. Allison continued by telling Nurse Carriker that Lumsden had

> kept pushing his finger into her butt and swirling his hand around, and she said it did hurt and that he touched his -- his pee part is what she called it and then she said swirling it around and playing with it. And then he kissed her on the lips and that he always does that and that he tried to get her to touch his private part but she said no.

On cross-examination, Lumsden asked Nurse Carriker if Allison had told her "when [she] came into the room" that she had come to see a doctor for an injury or for being hurt or sick, and Nurse Carriker said, "Not at that time."

At the conclusion of the hearing, Lumsden objected to Nurse Carriker's testimony as follows:

> [Nurse] Carriker did not have any conversations with [Kelly], the child's mother, saying she's injured, she's hurt, we're seeking medical attention from you, which is what you would do if you were seeking a medical diagnosis or medical treatment. So we would argue that outcry does not come under any medical treatment hearsay exception. It does not come under any first person that's -- she -- this child has made an outcry to because the very reason she's there is law enforcement purposes, Your Honor. This child, by her own words, was not asking for treatment for being hurt or injured or being sick. She was only there at the direction of the police and her mother, and her mother did not tell [Nurse] Carriker that she was seeking her medical attention. It was all an act of the law enforcement, their search for evidence, Your Honor.

43

And for that reason and all of those reasons, [Nurse] Carriker's testimony on outcry or any medical opinions should be suppressed, Your Honor.

After the State set forth its argument for admission of Nurse Carriker's testimony as an outcry statement and Lumsden responded, the trial court ruled that Nurse Carriker could testify as an outcry witness and postponed its ruling on Lumsden's hearsay objection.

When Nurse Carriker testified before the jury, she said that her normal practice was to ask a child if she knew why she was there or if there was something that had happened to her that she was there to discuss or to talk about. When Nurse Carriker started the sexual assault examination of Allison, she was alone in the exam room with Allison because "a lot of times [children are] more open with us when there is not a parent in the room." Nurse Carriker testified that the first thing she did with Allison was obtain a history to help her know where to look for injuries and to help diagnose any medical condition that she may have had. Nurse Carriker described Allison's demeanor during the interview as "very matter of fact" and said that she had good eye contact and spoke very clearly. When the State asked Nurse Carriker what Allison had told her, Lumsden made a general hearsay objection. The trial court overruled Lumsden's objection. Lumsden did not request a running objection. Nurse Carriker thereafter testified regarding what Allison had told her and explained the findings she had made during her head-to-toe physical examination of Allison.

## 3. Analysis

Lumsden argues that the medical-diagnosis-or-treatment exception to the hearsay rule was inapplicable to Nurse Carriker's testimony because Allison was unaware she was seeking a medical diagnosis and because there is no evidence that Allison understood the importance of being truthful with Nurse Carriker. Lumsden, however, made only a general hearsay objection when the State asked Nurse Carriker what Allison said had happened to her. Because Lumsden had not previously obtained a ruling on his hearsay objection to Nurse Carriker's testimony, it was incumbent on him to repeat his specific objection when she testified at trial. *See Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003); *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). Lumsden therefore failed to properly preserve his complaint that the trial court abused its discretion by admitting Nurse Carriker's testimony about Allison's statements to her during the sexual assault examination. *See San German-Reyes v. State*, No. 03-15-00432-CR, 2017 WL 2229873, at *9 (Tex. App.—Austin May 17, 2017, no pet.) (mem. op., not designated for publication) (holding that appellant failed to properly preserve his complaint that trial court erred by admitting SANE's testimony about victim's statements to her about sexual abuse because the State failed to demonstrate the veracity component of the exception).

Even if we assume that this issue had been properly preserved, the admission of the complained-of testimony was not error because it was admissible under the medical-diagnosis-or-treatment exception to the hearsay rule. The statements at issue

were made by a victim to a SANE during the context of a sexual assault examination at a hospital. Nurse Carriker interviewed Allison away from her mother, thus implicitly determining that Allison was sufficiently mature to be interviewed outside her mother's presence. Nurse Carriker specifically testified that the statements that Allison made to her enabled her to know where to look on Allison's body for injuries and to help diagnose any medical condition that Allison may have had.

Lumsden argues that the hearsay exception in rule 803(4) is inapplicable because Allison testified that she did not ask to see a doctor or nurse and because she "was unaware she was speaking to a medical professional seeking medical diagnosis." Lumsden has not cited, and we have not found, case law requiring the victim to ask to see a doctor or a nurse in order for the medical-diagnosis-or-treatment exception to apply. Additionally, the record reflects that Allison knew that she was talking to a nurse and was able to answer Nurse Carriker's question regarding why she was there—because Lumsden had touched her privates. *See Swofford*, 2015 WL 7019762, at *4 (holding that trial court could have reasonably inferred from the record that victim was aware her statements were made for the purpose of medical diagnosis or treatment because when nurse asked why she was there, victim stated, "My daddy made me suck his private part to make it bigger"). Moreover, Allison told Nurse Carriker about being hurt or injured when she informed Nurse Carriker that the tear in her anus bothered her. Although no specific inquiry was made in this case to determine whether Allison appreciated the need to be truthful in her statements to

46

Nurse Carriker, the circumstances under which Nurse Carriker examined Allison are circumstances that the trial court could have reasonably viewed as indicating that Allison would have known that she needed to be truthful. *See Beheler*, 3 S.W.3d at 189 (holding record supported conclusion that victim appreciated the need to be truthful in her statements to nurse).

After reviewing the entire record, we conclude that because the record demonstrates that Allison was a child of a sufficient age and apparent maturity and that she understood that she was at the hospital because of the sexual assault, she understood the need to be truthful during the sexual assault examination. *See id.* (holding evidence sufficient to support finding that seven-year-old child understood need for veracity in sexual assault examination after process was explained and child was interviewed alone, appeared calm and quiet, and knew why she was there); *San German-Reyes*, 2017 WL 2229873, at *11 (holding, even without a fully developed record of the conversation between nurse and victim, that victim was a child of sufficient age and maturity, that she was there because of a sexual assault, and that she understood the need to be truthful). Nurse Carriker's testimony was therefore admissible under the medical-diagnosis-or-treatment exception to the hearsay rule. *See Franklin*, 459 S.W.3d at 678 (holding SANE's testimony was properly admitted as statements made for the purpose of medical diagnosis).[17]

---

[17]Because we hold that the complained-of statements were properly admitted under the medical-diagnosis-or-treatment exception to the hearsay rule, we need not

47

Accordingly, we hold that the trial court did not abuse its discretion by allowing Nurse Carriker's testimony regarding the statements Allison made to her during the sexual assault examination, and we overrule Lumsden's fifth issue.[18]

## D. Admission of State's Exhibit No. 4

In his sixth issue, Lumsden argues that the trial court reversibly erred by admitting State's Exhibit No. 4—Nurse Carriker's handwritten report. When Lumsden objected during the trial to the admission of State's Exhibit No. 4 as containing hearsay, the State responded that the exhibit constituted Nurse Carriker's documents and findings as an expert. Lumsden argues on appeal that there is no exception to the rule against hearsay for the documents or findings of an expert.

Although the State gave an incorrect explanation for why the trial court should overrule Lumsden's hearsay objection, we may uphold the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case. *See Gonzalez,*

address Lumsden's alternative argument that Nurse Carriker's testimony was not admissible under article 38.072—the outcry exception to the hearsay rule. *See Reed v. State*, 497 S.W.3d 633, 638 (Tex. App.—Fort Worth 2016, no pet.) (holding that SANE's testimony could have been properly admitted under rule 803(4) and not addressing appellant's argument regarding the propriety of admitting the SANE's testimony under the outcry exception).

[18]Furthermore, even if we assumed that the admission of Nurse Carriker's testimony was erroneous, such error would have been harmless because the same or similar evidence was also offered through the testimony of Allison and Kelly. *See San German-Reyes*, 2017 WL 2229873, at *11–12 (holding that SANE's testimony was properly admitted but also stating that it was harmless if it was admitted in error); *Hanke v. State*, No. 09-14-00326-CR, 2015 WL 5604680, at *7 (Tex. App.—Beaumont Sept. 23, 2015, no pet.) (mem. op., not designated for publication) (same).

48

195 S.W.3d at 126; *see also Hailey v. State*, 87 S.W.3d 118, 121 (Tex. Crim. App. 2002) ("It is well-settled that a Court of Appeals can **affirm** a trial court's decision on a legal theory not presented to the trial court"), *cert. denied*, 538 U.S. 1060 (2003). Based on our review of the record set forth in issue five above, we held that Nurse Carriker's testimony was admissible under the medical-diagnosis-or-treatment exception to the hearsay rule. Her handwritten report is similarly admissible under the medical-diagnosis-or-treatment exception to the hearsay rule. *See* Tex. R. Evid. 803(4); *Martinez v. State*, No. 01-15-00823-CR, 2016 WL 6803233, at *11–12 (Tex. App.—Houston [1st Dist.] Nov. 17, 2016, pet. ref'd) (mem. op., not designated for publication) (stating that rule 803(4) may encompass medical records documenting the sexual abuse of children and upholding trial court's admission of SANE's report under medical-diagnosis-or-treatment exception to rule against hearsay), *cert. denied*, 138 S. Ct. 214 (2017); *Juarez v. State*, No. 04-15-00413-CR, 2016 WL 1359372, at *7 (Tex. App.—San Antonio Apr. 6, 2016, no pet.) (mem. op., not designated for publication) (upholding trial court's admission of SANE's report under medical-diagnosis-or-treatment exception to rule against hearsay). Because a proper hearsay exception governs the admissibility of Nurse Carriker's report, it is of no legal consequence that the State's explanation for the admissibility of the report at trial did not fall within one of the hearsay exceptions. *See Hailey*, 87 S.W.3d at 121.

Moreover, Lumsden did not request a running objection or continue to object when Nurse Carriker testified to the contents of her report both prior to and after it

49

was admitted into evidence. Nor did Lumsden object when Deleon testified regarding Nurse Carriker's findings from the sexual assault examination of Allison. Because the preservation rule requires a party to object each time objectionable evidence is offered unless the party has obtained a running objection or has requested a hearing outside the presence of the jury, *see Geuder*, 115 S.W.3d at 13, and because unobjected-to testimony about objected-to evidence results in forfeiture of the objection, we hold that Lumsden forfeited any error in the admission of State's Exhibit No. 4—Nurse Carriker's report. *See Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (explaining that Texas applies the "futility rule," meaning that despite a trial court's ruling that evidence is admissible, a party must keep making futile objections on pain of waiver); *Clay v. State*, 361 S.W.3d 762, 767 (Tex. App.—Fort Worth 2012, no pet.) ("[B]ecause Wallace provided testimony about the Louisiana records without objection before and after appellant's objection to the admission of the records and because appellant failed to obtain a running objection, we conclude that he forfeited his objection to the records' admission." (footnote omitted)).

Accordingly, we overrule Lumsden's sixth issue.

## E. Admission of State's Exhibit No. 13

In his seventh issue, Lumsden argues that the trial court reversibly erred by admitting State's Exhibit No. 13—the video of Alvarado's forensic interview of Allison. Lumsden contends that the video contained inadmissible hearsay that is not a

prior consistent statement and that its probative value was substantially outweighed by unfair prejudice.

## 1. Applicable Law

Texas Rule of Evidence 801(e)(1)(B) gives substantive, nonhearsay status to prior consistent statements of a witness "offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Tex. R. Evid. 801(e)(1)(B). Because this rule is similar to its federal counterpart, the Texas Court of Criminal Appeals has looked to the analysis provided in federal decisions. *See Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007). The United States Supreme Court has explained the four requirements that must be met for prior consistent statements to be admissible under the federal counterpart:

> (1) the declarant must testify at trial and be subject to cross-examination;
>
> (2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent;
>
> (3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and[]
>
> (4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*Id.* (citing *Tome v. United States*, 513 U.S. 150, 156–58, 115 S. Ct. 696, 700–02 (1995)). The rule sets forth a minimal foundation requirement of an implied or express charge of fabrication or improper motive. *Id.* In any event, "there need be only a suggestion that the witness consciously altered his testimony in order to permit the use of earlier

51

statements that are generally consistent with the testimony at trial." *Id.* (citation omitted). The fact that "there need be only a suggestion" of conscious alteration or fabrication gives the trial court substantial discretion to admit prior consistent statements under the rule. *Id.* Thus, the court of criminal appeals has noted

> that a reviewing court, in assessing whether the cross-examination of a witness makes an implied charge of recent fabrication or improper motive, should focus on the "purpose of the impeaching party, the surrounding circumstances, and the interpretation put on them by the [trial] court." Courts may also consider clues from the voir dire, opening statements, and closing arguments. From the totality of the questioning, giving deference to the trial judge's assessment of tone, tenor, and demeanor, could a reasonable trial judge conclude that the cross-examiner is mounting a charge of recent fabrication or improper motive? If so, the trial judge does not abuse his discretion in admitting a prior consistent statement that was made before any such motive to fabricate arose.

*Id.* at 808–09 (internal citations omitted).

## 2. Relevant Portion of the Record

During cross-examination of Deputy Floyd, Lumsden asked about the effect of asking a child leading questions:

> Q. What are the concerns if somebody asked a child leading questions where the child just answers yes or no? What's your understanding of what that can lead to, or inaccurate answers? Is that -- is that kind of what it leads to is some inaccurate answers?
>
> A. Based on the questions that are being asked.
>
> Q. Okay. And . . . if you just are asking a child and they just have to say yes or no, that may not tell the whole story. Is that fair to say?
>
> A. That's fair.

52

Q. And sometimes that's -- an adult can put words in a child's mouth if they ask a leading question and the child just has to answer yes or no. Is that fair to say?

A. That's fair.

Later during a hearing outside the presence of the jury, the State informed the trial court that it planned to offer the video of Allison's forensic interview into evidence, and Lumsden made a general hearsay objection. The following discussion then took place:

> [THE PROSECUTOR]: Okay. Judge, I believe he has opened the door for us to get in a prior consistent statement to rebut a recent fabrication. Because he went down the line of questioning, especially with Deputy Floyd, that isn't it true that if you ask a child leading questions then this, which opens the door and leaves the impression to the jury that since, I guess, leading questions were asked that it's possible that she was fabricating her story.
>
> I have a case. It's called Hammons v. State. It is 239 S.W.3d 798. In order to get in a prior consistent statement, there are four things that the Court must look at . . . .
>
> It also states that there [are] minimal foundation requirements of an implied or express charge of fabrication, so just any -- any kind of implication that we have suggested or any kind of leading -- leading questions have suggested that -- that has tampered with her statement or that it's made her -- her statements different than what it was at the time, that will allow the Court to let the forensic interview in. . . .

The trial court asked Lumsden what his specific objection was to the forensic interview, and he replied:

> One objection is hearsay. The other one is we have not opened the door. The only question we asked the mother was she asked her a yes or no question. That was really the only thing that was asked, whether she was led with any questions or not. The question that -- to Officer Floyd

53

was a generalization of when he's working with children that sometimes you need to -- is if he's -- if the child is asked leading questions, it can lead to unreliable responses.

[THE PROSECUTOR]: Which that's my point exactly, that he's left the impression with the jury that her responses are unreliable as they were in court today is what he's saying, so that is a recent fabrication. It is implied, if not direct. As that case states, it's -- a minimal foundation has to be laid that there's any impression in front of the jury that her testimony has been somehow fabricated.

. . . .

THE COURT: And so the only prior consistent statement that you're wanting to get into is the statement from the witness that it's not fabricated? Is that what[] -- the video is going to purport to say?

[THE PROSECUTOR]: Right. That -- that her testimony today as to what happened is not a fabrication because she told the jury what happened, but it left in the mind of the jury that someone asking leading questions could have fabricated her answers. And so with that, when I was asking [Allison] questions, you know, as -- as a scared witness, I was somewhat leading her, but I want to show the jury because he left that impression with them that she did have prior consistent statements.

[DEFENSE COUNSEL]: I didn't cross-examine the child witness to leave in any impression that she was fabricating any statement or had an ulterior motive or was put up to it, Your Honor, so, you know, that door would be closed there if I didn't cross-examine the child.

. . . .

THE COURT: . . . [A]fter reviewing Hammons and just taking a specific look at [rule] 801, I believe that they're entitled to offer the video by virtue of the line of questioning as to saying that an adult was leading them and it would cause her to give a response. I don't know that there's any way, at least by virtue of the rules, that it should be denied. So if the objection is simply hearsay, I think that I'll overrule that objection[,] and the video can be played as a prior consistent statement of the witness.

[DEFENSE COUNSEL]: Well, unfair prejudice to the Defendant, Your Honor.

THE COURT: If it's simply a prior consistent statement, I can't find that's a [rule] 403 violation.

## 3. Analysis

Lumsden's cross-examination of Deputy Floyd did not imply that Allison had recently fabricated her statements. Rather, he intended to show that Kelly's use of leading questions the morning after the sexual assault had put words in Allison's mouth regarding the alleged perpetrator from the outset. Lumsden's trial strategy was largely focused upon convincing the jury that even though Allison may have been sexually assaulted, she had misidentified the perpetrator from the beginning, not that she changed her story later on, which is the situation to which rule 801(e)(1)(B) is intended to apply. *See Tome*, 513 U.S. at 158, 115 S. Ct. at 701; *Hammons*, 239 S.W.3d at 804; *see also Klein v. State*, 273 S.W.3d 297, 316–17 (Tex. Crim. App. 2008) (holding prior consistent statements of abuse by child complainant were admissible when child claimed during her testimony that her allegations of abuse were "improperly influenced by the State's trickery in questioning her"). The trial court therefore abused its discretion by admitting the video of the forensic interview. *See Woods v. State*, No. 02-17-00367-CR, 2018 WL 5289461, at *10 (Tex. App.—Fort Worth Oct. 25, 2018, no pet. h.) (mem. op., not designated for publication) (holding that trial court abused its discretion by admitting video of forensic interview because defense did not imply that victim had recently fabricated her statements).

Having found error, we proceed to a harm analysis. Because we determine that the error is not constitutional, rule 44.2(b) is applicable. Tex. R. App. P. 44.2(b). Texas courts, including this court, have repeatedly held that testimony about and recordings of a child's statements concerning a sexual crime are harmless when other, unobjected-to evidence proves the same facts. *See Matz v. State*, 21 S.W.3d 911, 912–13 (Tex. App.—Fort Worth 2000, pet. ref'd); *Stephens v. State*, Nos. 02-15-00046-CR, 02-15-00047-CR, 2016 WL 2586639, at *4 (Tex. App.—Fort Worth May 6, 2016, pet. ref'd) (mem. op., not designated for publication) (collecting cases).

The most important part of the video—Allison's description of the incident that occurred on the couch—largely resembled her in-court testimony and her descriptions as testified to by Kelly and Nurse Carriker, which are detailed above. Although Allison's description of the events in the forensic interview provided more detail than her trial testimony, it provided essentially the same story, and we find it unlikely that the jury was inclined to reject Allison's story of sexual abuse but changed its mind after hearing it again in the recording. *See Woods*, 2018 WL 5289461, at *10–11 (holding that erroneous admission of forensic interview video, in which child described abuse with more detail, was harmless); *Todd v. State*, Nos. 02-12-00114-CR, 02-12-00115-CR, 2013 WL 1457735, at *5 (Tex. App.—Fort Worth Apr. 11, 2013, pet. ref'd) (mem. op., not designated for publication) (same); *see also Shaw v. State*, 122 S.W.3d 358, 364 (Tex. App.—Texarkana 2003, no pet.) ("Because the State sufficiently proved the fact to which the hearsay relates by other competent and

56

unobjected-to evidence . . . , we hold the admission of the hearsay constituted nonreversible error."). We hold that the admission of the video of the forensic interview does not constitute reversible error. *See Matz*, 21 S.W.3d at 912–13.

We conclude that, in the context of the entire case against Lumsden, the trial court's error in admitting the video of the forensic interview did not have a substantial or injurious effect on the jury's verdict and did not affect Lumsden's substantial rights. *See King*, 953 S.W.2d at 271. Thus, we disregard the error, *see* Tex. R. App. P. 44.2(b), and overrule Lumsden's seventh issue.[19]

## F. Admission of Testimony about Victim's Fearfulness of Looking at Abuser

In his eighth issue, Lumsden argues that the trial court reversibly erred by allowing a witness to speculate that it "would be fearful for a child" to look her abuser in the face and identify him.

During the trial, which took place a year and a half after the incident, Allison was asked to look around the courtroom and see if Lumsden was present. Allison testified that she did not see him. Allison was asked to look around the courtroom one more time and see if Lumsden was present, but she said that she did not see him; the record reflects that Lumsden was present in the courtroom at that time. During Deleon's testimony, the State asked:

---

[19]Based on our holding—that it was error for the trial court to admit the video of the forensic interview but that the admission was harmless—we need not address Lumsden's rule 403 argument related to the admission of the video. *See* Tex. R. App. P. 47.1.

Q. Marco, in your training and experience, would it be uncommon for an eight-year-old abuse victim to be terrified to look her abuser in the face and identify him?

[DEFENSE COUNSEL]: Objection to speculation, Your Honor.

THE COURT: Overruled.

A. In my training, no, that would not -- that would be fearful for a child.

Q. That would be -- that would be common for a child to be fearful to look at her [abuser] in the face in open court and point them out?

A. Absolutely.

To preserve error, a party must continue to object each time the objectionable evidence is offered. *See Geuder*, 115 S.W.3d at 13; *Martinez*, 98 S.W.3d at 193. A trial court's erroneous admission of evidence will not require reversal when other such evidence was received without objection, either before or after the complained-of ruling. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010), *cert. denied*, 562 U.S. 1142 (2011); *Lane v State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004).

As set forth above, after Deleon provided his answer to the objected-to question, Lumsden did not request a running objection, nor did he request a hearing outside the presence of the jury so that he would not have to continuously object. When the State followed up by asking Deleon a question almost identical to the initial objected-to question, Lumsden did not object. Because Deleon's answer to the second question was received without objection, Lumsden failed to preserve error. *See* Tex. R. App. P. 33.1(a); *Ethington v. State*, 819 S.W.2d 854, 859–60 (Tex. Crim.

58

App. 1991) (holding that appellant's objection to the first question asked of witness did not preserve error as to the following three pages of questions and answers on the same subject when appellant failed to obtain a running objection or request a hearing outside the presence of the jury so that he would not have to keep objecting). We overrule Lumsden's eighth issue.

## G. Admission of Testimony about Lumsden's Creating False Identities and Tampering with Government Records

In his ninth issue, Lumsden argues that the trial court reversibly erred by allowing the State to "get into the fact that [Lumsden] was 'creating false identities' and was charged with tampering with governmental records."

### 1. Applicable Law

An accused puts his character for veracity in issue by taking the stand, and he may be impeached in the same manner as any other witness. *See Hammett v. State*, 713 S.W.2d 102, 105 (Tex. Crim. App. 1986). Generally, prior offenses are inadmissible for impeachment purposes unless the offense resulted in a final conviction for either a felony or a crime involving moral turpitude and the conviction is not too remote in time. *See Ochoa v. State*, 481 S.W.2d 847, 850 (Tex. Crim. App. 1972); *Turner v. State*, 4 S.W.3d 74, 78–79 (Tex. App.—Waco 1999, no pet.); *see also* Tex. R. Evid. 608, 609. However, an exception arises when a defendant testifies and leaves a false impression as to the extent of his prior arrests, convictions, charges against him, or "trouble" with the police generally. *See Prescott v. State*, 744 S.W.2d 128,

131 (Tex. Crim. App. 1988); *Ochoa*, 481 S.W.2d at 850.  In such a case, the defendant is deemed to have "opened the door" to an inquiry into the veracity of his testimony, and evidence of the defendant's prior criminal record is admissible to correct the false impression.  *See Martinez v. State*, 728 S.W.2d 360, 362 (Tex. Crim. App. 1987); *Turner*, 4 S.W.3d at 79.

Generally, the false impression the State seeks to rebut must be created by the defendant through direct examination.  *See Wheeler v. State*, 67 S.W.3d 879, 885 (Tex. Crim. App. 2002).  However, when a defendant voluntarily testifies on cross-examination concerning his prior criminal record, without any prompting or maneuvering on the part of the State, and in so doing leaves a false impression with the jury, the State is allowed to correct that false impression by introducing evidence of the defendant's prior criminal record.  *Martinez*, 728 S.W.2d at 362; s*ee also Roberts v. State*, 29 S.W.3d 596, 601 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).  The only requirement is that, if the "opening door" testimony is volunteered by the defendant on cross-examination, it must be volunteered without any prompting or maneuvering by the State.  *Lopez v. State*, 928 S.W.2d 528, 531–32 (Tex. Crim. App. 1996).

## 2.  Relevant Portion of the Record

As set forth in the factual background above, Lumsden testified in his case in chief that he was convicted of fifth-degree burglary in Minnesota when he was sixteen years old and that he served time in prison.  Lumsden also testified that he pleaded guilty to felony harassment in 1996 and received twenty years' probation.  Lumsden's

counsel asked if it was correct that Lumsden went back to prison in Minnesota on the felony harassment case, and Lumsden answered, "Well, not voluntarily[,] but I went back, yes."

Prior to the State's cross-examination of Lumsden, the prosecutor alerted the trial court that she planned on getting into Lumsden's "other priors. He has opened the door to the fake -- the false identity or the identity theft charges." Lumsden's counsel stated, "That was deferred adjudication. That's not a criminal conviction, Your Honor." The prosecutor responded that "[i]t's not a criminal conviction, but he alluded to the fact that he -- he didn't go back willingly to prison. But that's why he went back. I mean, it's -- it's semi-opened the door to that." The trial court overruled Lumsden's objection that going into the "other priors" would be unfairly prejudicial.

During cross-examination, the State questioned Lumsden as follows:

Q. (BY [PROSECUTOR]) So it's your testimony that you don't know why you got sent back to Minnesota?

A. I do not know why.

Q. Could it have been that you were tampering with government documents?

[DEFENSE COUNSEL]: Objection. It's unduly prejudicial, Your Honor.

THE COURT: Overruled.

A. I mean, that's -- that's -- I guess that may have been what they said, yes, that maybe that's why, I guess. I don't know if that's why.

61

The State then proceeded to ask Lumsden if he had tampered with government documents, such as birth certificates and Social Security cards, to create false identities for himself.

### 3. Analysis

Here, Lumsden's statement on direct—that he did not voluntarily go back to prison—did not give the impression that he was a law-abiding citizen. Instead, his statement implies that he had violated at least one of his probation conditions, which resulted in his return to prison. The relevant questions, the answers themselves, and the overall tenor of the cross-examination did not create a false impression with the jury concerning Lumsden's prior criminal history. *See Prescott*, 744 S.W.2d at 131. Moreover, through cross-examination, the State maneuvered its questioning to elicit the answer from Lumsden that he did not know why he was sent back to prison in Minnesota. The State's sole reason then for offering the evidence of Lumsden's tampering with government records was to impeach him under rules 608(b) and 609. But the State conceded that this "other prior" was not a final conviction. Accordingly, we hold that the trial court abused its discretion by allowing the State to delve into the evidence of tampering with government records. *See Montgomery v. State*, 810 S.W.2d 372, 392–93 (Tex. Crim. App. 1990) (op. on reh'g); *West v. State*, 169 S.W.3d 275, 278–79 (Tex. App.—Fort Worth 2005, pet. ref'd) (holding that trial court abused its discretion by allowing State to ask appellant whether he had been

arrested over twenty times because appellant did not "open the door" to impeachment evidence); *see also Owen v. State*, No. 02-03-00164-CR, 2004 WL 966323, at \*8 (Tex. App.—Fort Worth May 6, 2004, no pet.) (mem. op., not designated for publication) (holding that trial court abused its discretion by allowing the State to impeach appellant with unadjudicated offenses in violation of rules 608(b) and 609).

Having found error, we proceed to a harm analysis. Because we determine that the error is not constitutional, rule 44.2(b) is applicable. *See* Tex. R. App. P. 44.2(b). First, the bulk of the testimony and physical evidence that was admitted for the jury's consideration focused on the offenses for which Lumsden was on trial. Second, the record contains ample evidence, as set forth in detail in previous analysis sections, supporting Lumsden's guilt. Third, the character of the alleged error in permitting the State to question Lumsden about tampering with government documents was minor and likely played a small role, if any, in the jury's deliberations. After the State asked Lumsden whether he was sent back to prison for tampering with government documents, the State asked several follow-up questions to ascertain if Lumsden had created false identities for himself and why he had a birth certificate and a Social Security card that were not in his name. The State did not, however, dwell on this other offense. During its closing argument, the State mentioned only the Minnesota conviction that Lumsden received at age sixteen; it did not delve into the charge of tampering with government records or mention his creating false identities. Additionally, the court's charge instructed the jury

that if there is any testimony before you in this case regarding the defendant's having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same in determining the state of mind of the defendant and the child; and the previous and subsequent relationship between the defendant and the child, if any, or the intent of the defendant, if any, in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose.

The court's charge further instructed the jury that

[a]ll persons are presumed to be innocent and no person may be convicted of any offense unless each element of the offense is proved beyond a reasonable doubt. The fact, that a person has been arrested, confined, or indicted for, or otherwise charged with, the offense, gives rise to no inference of guilt at his trial.

We conclude that, in the context of the entire case against Lumsden, the trial court's error in permitting the State to question Lumsden about tampering with government records did not have a substantial or injurious effect on the jury's verdict and did not affect Lumsden's substantial rights. *See King*, 953 S.W.2d at 271; *West*, 169 S.W.3d at 281 (holding that trial court's error in permitting the State to ask appellant whether he had been arrested more than twenty times did not have a substantial or injurious effect on the jury's verdict and did not affect appellant's substantial rights); *Owen*, 2004 WL 966323, at *10 (holding that trial court's error in admitting testimony about appellant's possession of fictitious credit cards and driver's licenses was not harmful). Thus, we disregard the error, *see* Tex. R. App. P. 44.2(b), and overrule Lumsden's ninth issue.

64

## H. Sustaining State's Objections to Lumsden's Testimony

In his tenth issue, Lumsden argues that the trial court reversibly erred by sustaining the State's "nonresponsive" objections to his admissible testimony. Lumsden challenges the following objections to his testimony:

Q. So it is your testimony that -- are all of your kids at home all the time?

A. No, not all the time.

Q. So you're worried that [Kelly], who doesn't work, and none of your children are in the home, you're worried that she's going to leave and all of the sudden you're going to be with no child care?

A. That's exactly correct. That's exactly what it is, because my kids come all the time. And [Rhonda] -- I pick [Rhonda] up from school. I would take her on days where she wasn't -- I didn't just have --

　　　[PROSECUTOR]: Object to nonresponsive.

　　　THE COURT: Sustained after "That's exactly correct."

　　　. . . .

Q. And so if she had split -- I mean, if she had custody even on the first, third[,] and fifth and then every other Tuesday or Thursday or whatever the case may be, would that be more than three or four times?

A. She was supposed to have them more than three or four times, yes.

Q. Would [Allison] have been in your home more than three or four times?

A. Same statement. She should have been but she wasn't. She didn't come. She never -- she didn't come. That's what I'm telling you.

　　　[PROSECUTOR]: Objection. Objection.

THE COURT: As to nonresponsive?

[PROSECUTOR]: Yes. I'm sorry, Judge.

THE COURT: Sustained.

. . . .

Q. You heard [Kelly] testify that you were the one who told her about those allegations. Correct?

A. No. That's not what she said. She said we had talked about it six weeks prior to that.

[PROSECUTOR]: Objection. Nonresponsive.

THE COURT: Sustained.

. . . .

Q. So you said -- I guess you heard that [David] up there on the stand said that he never heard anything like that?

A. I heard him say that.

Q. Is [David] lying?

A. I wouldn't know that he would be lying. Whether he remembered that two years ago, I don't know, but he -- he -- he --

[PROSECUTOR]: Object to nonresponsive.

THE COURT: Sustained.

. . . .

Q. Burglary of a motor vehicle. So if I have this in my hand and it's a transcript of that plea, are you denying that that's why you were sent to the penitentiary for burglary?

A. Why I was --

Q. Would a court reporter be lying?

A. I don't understand -- I wasn't sent to prison for stealing a car. It was for burglary at the pool. That's what -- that's what -- that's why I went. That's what it says.

[PROSECUTOR]: Object to nonresponsive.

A. I don't understand the question I guess.

THE COURT: Sustained.

. . . .

Q. And has it been your testimony elsewhere that you were only 16 years old when you were sent to that big boy prison?

A. I -- yeah, I believe that it was -- I was 16 because I was 16 when it happened, so I -- I --

[PROSECUTOR]: Object to nonresponsive.

THE COURT: Sustained.

. . . .

Q. You were creating them but it was for a book. What were you going to do for that book?

A. I was writing a book about identity theft, how easy it is to assume an identity, create an identity. My identity had been used. My credit has been -- I was dealing with a credit repair agency, and I was very frustrated about --

[PROSECUTOR]: Objection. Nonresponsive.

THE COURT: Sustained.

. . . .

Q. (BY [PROSECUTOR]) Were you trying to get your mortgage broker's license or were you writing a book?

A. I had a mortgage broker's license already in Minnesota. I was already -- I was a broker for 15 years.

Q. Why couldn't you get one in Texas?

A. I don't remember that I couldn't get one in Texas. I don't remember if I could or couldn't get one in Texas. I was already doing Texas loans. I don't know if you -- that was 15 years ago. I don't remember.

 [PROSECUTOR]: Object to nonresponsive.

 THE COURT: Sustained.

 . . . .

Q. And correct me if I'm wrong, but wouldn't a patrilineal cousin have the same name as you?

A. Troy is cousins –

 [PROSECUTOR]: Object. Nonresponsive.

 THE COURT: Sustained.

When a witness answers a question and the trial court later sustains an objection to the question but does not instruct the jury to disregard the answer, the answer remains "before the jury" to be freely considered. *See Estrada*, 313 S.W.3d at 313; *Dozal v. State*, No. 02-13-00478-CR, 2015 WL 120491, at *2 (Tex. App.—Fort Worth Jan. 8, 2015, no pet.) (mem. op., not designated for publication). Generally, no harm results when a jury is not instructed to disregard a witness's answer after an

objection is sustained. *See Johnson v. State*, 925 S.W.2d 745, 750 (Tex. App.—Fort Worth 1996, pet. ref'd).

Here, any error in sustaining the State's nonresponsive objections did not affect a substantial right of Lumsden. The State objected to Lumsden's answers as nonresponsive but did not seek a limiting instruction. Because the trial court did not instruct the jury to disregard Lumsden's answers, the answers became part of the general evidence. *See Estrada*, 313 S.W.3d at 313; *Dozal*, 2015 WL 120491, at *2. Thus, because the jury could have considered Lumsden's answers despite the trial court's sustaining the State's nonresponsive objections, we cannot conclude that the record establishes harm under rule 44.2(b). *See* Tex. R. App. P. 44.2(b); *Estrada*, 313 S.W.3d at 313; *Dozal*, 2015 WL 120491, at *2; *Johnson*, 925 S.W.2d at 750. We therefore overrule Lumsden's tenth issue.

## I. Admission of State's Exhibit No. 30

In his twelfth issue, Lumsden argues that the trial court reversibly erred by admitting State's Exhibit No. 30—a binder of documents. The documents included a voter registration card, a driver's license, a Social Security number, school records, a birth certificate, and a college degree for Raymond Robert Marcucci; a driver's license and a certificate of baptism for Raymond Edward Lumsden; a delayed registration of birth form, a birth certificate, a certificate of baptism, and a Headstart completion certificate for Anthony Ray Marcucci; school records and a delayed registration of birth form for Amanda Marie Marcucci; and a document entitled "Secrets for Getting

a New Identity." When the State offered the binder into evidence, Lumsden objected

as follows:

> [DEFENSE COUNSEL]: We'd object as to the hearsay nature of the contents, Your Honor, unfairly prejudicial to the Defendant.
>
> THE COURT: Just to make sure that I'm certain, [Prosecutor], I've heard the identification of a notebook and some in there. I'm assuming that you're offering that the documents in there are what they purport to be, that they've not been altered or deleted[,] and that they speak for themsel[ves]?
>
> [PROSECUTOR]: Yes, Judge.
>
> THE COURT: [Defense counsel], do you still have any objection?
>
> [DEFENSE COUNSEL]: Same objections, Your Honor.
>
> THE COURT: All right. Overruled.

When an exhibit contains both admissible and inadmissible material, the

objection to the exhibit must specifically refer to the challenged material to apprise

the trial court of the exact objection. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim.

App. 1995). If the party who objects to the exhibit containing both admissible and

inadmissible evidence does not specify which part of the exhibit is not admissible, the

asserted error in admitting the evidence is not preserved for review. *Wintters v. State*,

616 S.W.2d 197, 202 (Tex. Crim. App. [Panel Op.] 1981).

The exhibit to which Lumsden objected contains over thirty pages of various

documents. Our review of the exhibit reveals that the exhibit contains at least some

evidence that the trial court would not have abused its discretion by admitting.

70

Specifically, the birth certificates constitute public records of vital statistics and thus would have been admissible under the exception to the hearsay rule found in Texas Rule of Evidence 803(9), and the certificates of baptism would have been admissible under the exception to the hearsay rule found in Texas Rule of Evidence 803(12). *See* Tex. R. Evid. 803(9), (12).

Thus, in order to preserve error, Lumsden was required to identify for the trial court the portions of the documents within the exhibit that he considered inadmissible. Lumsden's global hearsay objection to the entire exhibit, without specifying the documents that he found to be objectionable, failed to preserve error in the trial court's admission of State's Exhibit No. 30. *See Sonnier*, 913 S.W.2d at 518 (holding general objection to entire video recording without specific reference to challenged material did not inform trial court of specific objection and did not preserve error for appeal); *Rosales v. State*, No. 03-15-00735-CR, 2017 WL 5247497, at *4 (Tex. App.—Austin Nov. 10, 2017, pet. ref'd) (mem. op., not designated for publication) (holding global hearsay objection to exhibit containing forty-seven pages of written statements did not preserve error); *Williams v. State*, 927 S.W.2d 752, 760 (Tex. App.—El Paso 1996, pet. ref'd) (holding that by failing to specify which parts of State's Exhibits 24 through 28 constituted inadmissible hearsay, appellant waived error).

To the extent that Lumsden attempted to object based on rule 403 that the documents were more prejudicial than probative, his general rule 403 objection was

71

not specific enough to let the trial judge know why Lumsden believed that State's Exhibit No. 30 was not admissible based on rule 403. *See Resendez v. State*, 306 S.W.3d 308, 312–13 (Tex. Crim. App. 2009); *Checo v. State*, 402 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). Because Lumsden's rule 403 objection was not sufficiently specific, he forfeited any error in the admission of the documents contained in State's Exhibit 30. *See* Tex. R. App. P. 33.1(a)(1)(A); *Page v. State*, No. 02-17-00019-CR, 2017 WL 4819404, at *3 (Tex. App.—Fort Worth Oct. 25, 2017, pet. ref'd) (mem. op., not designated for publication) (holding appellant's general rule 403 objections not sufficiently specific to preserve error for review); *Checo*, 402 S.W.3d at 451 (same); *Williams v. State*, 930 S.W.2d 898, 901 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) (same).

We overrule Lumsden's twelfth issue.

## VII.  Cumulative Error

In his eleventh issue, Lumsden argues that "if this [c]ourt overrules the points of error in Issues One and Three (which are not subject to harm analyses) but finds that the trial court did err as argued in Issues(s) Two, Four, Five, Six, Seven, Eight, Nine[,] and/or Ten and that each error was harmless, then the errors warrant reversal of the trial court's judgment when considered cumulatively." Even considering the evidentiary errors we deemed harmless—admitting the video of the forensic interview, admitting the testimony about Lumsden's tampering with government records, and sustaining the State's "nonresponsive" objections to Lumsden's

72

testimony—we do not believe that the cumulative effect of the admission of this evidence requires reversal. *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999) ("It is conceivable that a number of errors may be found harmful in their cumulative effect."), *cert. denied*, 528 U.S. 1082 (2000); *Flores v. State*, 513 S.W.3d 146, 174–75 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Nothing in the record indicates that the State used the evidence to an unfair advantage or that the admission of the evidence deprived Lumsden of any constitutional rights or rendered the trial fundamentally unfair. *See Flores*, 513 S.W.3d at 175; *see also U.S. v. Stephens*, 571 F.3d 401, 412 (5th Cir. 2009) (noting that cumulative-error doctrine compels relief only when constitutional errors "fatally infect the trial," depriving a defendant of fundamental fairness). Moreover, Lumsden has not shown that the evidentiary errors "synergistically achieve the critical mass necessary to cast a shadow upon the integrity of the verdict." *See Linney v. State*, 413 S.W.3d 766, 767 (Tex. Crim. App. 2013) (Cochran, J., concurring in refusal of pet.) (explaining the doctrine of cumulative error). We therefore overrule Lumsden's eleventh issue.

## VIII. Closing Argument at Punishment

In his thirteenth issue, Lumsden argues that the trial court erred, abused its discretion, and denied him his right to counsel by instructing the jury to disregard part of his closing argument during the punishment phase. The relevant portion of Lumsden's closing argument is as follows:

State talks about the enhancements. Enhancement from 1990 when Mr. Lumsden was 16 or 17 years old. You must decide that's something you can hold against Mr. Lumsden, something that occurred 30 years ago.

[PROSECUTOR]: Objection, Your Honor, improper argument asking for jury nullification.

THE COURT: I'll sustain the objection.

[PROSECUTOR]: Ask the jury to disregard the last comment by counsel.

THE COURT: Jury will disregard the last comment by counsel.

## A. Standard of Review and Applicable Law

We review a trial court's ruling on an improper-jury-argument objection by the State for an abuse of discretion. *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010), *cert. denied*, 565 U.S. 830 (2011). Permissible jury argument falls into four distinct categories: (1) summary of the evidence; (2) reasonable deductions from the evidence; (3) response to opposing counsel's argument; or (4) a plea for law enforcement. *Brown v. State*, 270 S.W.3d 564, 570 (Tex. Crim. App. 2008), *cert. denied*, 556 U.S. 1211 (2009). Improper denial of jury argument may constitute denial of the right to counsel if the argument is one the appellant is entitled to make. *Davis*, 329 S.W.3d at 825 (citing *McGee v. State*, 774 S.W.2d 229, 238 (Tex. Crim. App. 1989), *cert. denied*, 494 U.S. 1060 (1990)). That "holding assumes, inter alia, that the jury argument is one the defendant is entitled to make." *Id.* Jury nullification[20] is not an

---

[20]Jury nullification refers to "the jury's power to acquit a defendant out of refusal to apply the law to facts clearly evidencing a criminal violation." *United States v.*

argument that a defendant is entitled to make because there is no constitutional right to jury nullification and because there is no constitutional requirement that the jury be instructed on nullification. *See Ramos v. State*, 934 S.W.2d 358, 367 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1198 (1997); *Stefanoff v. State*, 78 S.W.3d 496, 502 (Tex. App.—Austin 2002, pet. ref'd).

## B. Analysis

Lumsden argues on appeal that he was entitled to make his jury nullification argument because it was a response to the State's argument that when enhancements are proven beyond a reasonable doubt, punishment at the enhanced level is mandatory. Because the defendant does not have a constitutional right to instruct the jury on nullification, Lumsden was not entitled to make an argument for jury nullification. Accordingly, we hold that the trial court did not abuse its discretion by sustaining the State's objection to Lumsden's jury nullification argument. *See McGee*, 774 S.W.2d at 238 (holding that trial court did not abuse its discretion by rejecting appellant's argument, which was an incorrect statement of law and not an argument he was entitled to make); *Nalls v. State*, No. 02-16-00328-CR, 2018 WL 651193, at *8 (Tex. App.—Fort Worth Feb. 1, 2018, no pet.) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion by refusing to allow

---

*Burkhart*, 501 F.2d 993, 997 n.3 (6th Cir. 1974), *cert. denied*, 420 U.S. 946 (1975). Although the jury has the *power* to nullify, "it is the *duty* of the jury to follow the law as it is laid down by the court." *Sparf v. United States*, 156 U.S. 51, 74, 15 S. Ct. 273, 282 (1895) (emphasis added).

defendant to argue jury nullification); *Smith v. State*, No. 01-12-00423-CR, 2014 WL 2933220, at *7 (Tex. App.—Houston [1st Dist.] June 26, 2014, pet. ref'd) (mem. op., not designated for publication) (same). We overrule Lumsden's thirteenth issue.

## IX. Consecutive Sentences

In his fourteenth issue, Lumsden argues that the trial court abused its discretion by ordering his three life sentences to run consecutively. Lumsden argues that because criminal solicitation of a minor is not an offense for which Texas Penal Code section 3.03 authorizes consecutive sentences, his sentence for criminal solicitation of a minor must run concurrently with his other sentences.

### A. Standard of Review

We review a trial court's decision to cumulate sentences for an abuse of discretion. *See* Tex. Code Crim. Proc. Ann. art. 42.08(a) (West 2018). The trial judge has absolute discretion to cumulate sentences if the law authorizes the imposition of cumulative sentences. *Byrd v. State*, 499 S.W.3d 443, 446 (Tex. Crim. App. 2016). A trial court abuses its discretion if it imposes consecutive sentences where the law requires concurrent sentences. *Id.* at 447.

### B. Applicable Law

Texas trial courts have the discretion to order cumulative sentences in virtually every case. *See* Tex. Code Crim. Proc. Ann. art. 42.08(a). The principal exception to this rule is found in penal code section 3.03(a), which provides that when a defendant is found guilty at a single trial of more than one offense arising out of the same

76

criminal transaction, the sentences for each offense must run concurrently. Tex. Penal Code Ann. § 3.03(a) (West Supp. 2018). But section 3.03(b)(2)(A) creates an exception to this exception; that is, it exempts certain offenses, including indecency with a child and aggravated sexual assault of a child, from the application of section 3.03(a), thus allowing the trial court to order the sentences to run concurrently or consecutively. *Id.* § 3.03(b)(2)(A).

## C. The Trial Court's Cumulation Order

The State filed a motion for cumulative sentences, requesting that any sentences imposed in Count I (aggravated sexual assault of a child) and Count II (indecency with a child) run consecutively. The trial court heard the State's motion before sentencing Lumsden and granted the motion. When the trial court sentenced Lumsden to life on each of the three counts that he was convicted of, the trial court stated, "As per the judgment, the sentences will run consecutively." The judgment states that "[t]he sentence imposed under Count II of the indictment shall commence when the sentences imposed in Count I and Count III cease[] to operate."

## D. Analysis

Lumsden was convicted of two of the offenses enumerated in section 3.03(b)(2)(A): section 21.11 (indecency with a child, as set forth in Count II) and section 22.011 (aggravated sexual assault of a child, as set forth in Count I). The legislature gave the trial court the discretion to have sentences for these crimes run concurrently or consecutively. *See Nguyen v. State*, 359 S.W.3d 636, 643 (Tex. Crim.

App. 2012) (explaining legislative history of section 3.03 and stating that "[a]t the behest of prosecutors, [s]ections 3.03(b)(2)(A) & (B) were added to give trial judges the authority to cumulate sentences for multiple sex offenses against children that were part of a single criminal episode"). The trial court elected to have the sentences for Counts I and II run consecutively, which was allowed by law and clearly not an abuse of discretion. *See Millslagle v. State*, 150 S.W.3d 781, 784–85 (Tex. App.—Austin 2004, pet. dism'd, untimely filed). Similarly, because criminal solicitation of a minor is not listed in the exception to the exception found in section 3.03(b)(2)(A), the trial court properly allowed Count III to run concurrently with Count I. *See* Tex. Penal Code § 3.03. Accordingly, we overrule Lumsden's fourteenth issue.

## X.  Conclusion

Having overruled Lumsden's fourteen issues, we affirm the trial court's judgment.

/s/ Bill Meier
Bill Meier
Justice

Publish

Delivered:  November 8, 2018