**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00113-CR**
**NO. 09-23-00114-CR**

_____

**GREGORY SCOTT GUNTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 22-04-04980-CR, 23-01-00881-CR**

**MEMORANDUM OPINION**

In a single trial, a jury convicted Gregory Scott Gunter of one count of

assaulting his girlfriend, "Sally," by impeding breath or circulation and one count of

assaulting her and causing bodily injury.[1] *See* Tex. Penal Code Ann. §

---

[1]We refer to the victim by a pseudonym to conceal her identity. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[]").

1

22.01(b)(2)(A), (b-3). The State alleged enhancements for each count, and Gunter pleaded "true" to the enhancements. The jury assessed punishment at fifty-five years of incarceration for the strangulation count and twenty years of incarceration for the bodily injury count. The trial court sentenced Gunter accordingly and ordered the sentences to run concurrently. In one issue, Gunter complains the trial court violated his constitutional Due Process right to confront his accuser when it admitted "out-of-court hearsay evidence" and she did not appear at trial. For the reasons discussed below, we affirm the trial court's judgments.

## I. Background and Trial Evidence[2]

Gunter and Sally were in a dating relationship and lived together in a tent on his mother's property in Montgomery County. They were involved in a domestic dispute that began one night in April 2022 and spilled over into the next morning. The allegations included that Gunter 1) "imped[ed] the normal breathing or circulation of the blood of [Sally], by applying pressure to [Sally's] throat or neck or by blocking [Sally's] nose or mouth," and 2) "caus[ed] bodily injury to [Sally] . . . by striking, grabbing, hitting, biting, pulling, pushing victim with [his] arms, hand(s) and mouth[.]" After a grand jury indicted Gunter for the two counts of

---

[2]We limit our discussion of the background and trial evidence to matters necessary to the resolution of Gunter's sole issue. *See* Tex. R. App. P. 47.1 (requiring the appellate court to hand down an opinion "as brief as practicable").

assault family violence, the matter proceeded to a jury trial. Despite being subpoenaed by the State, Sally refused to appear at trial.

**Robin Parkin's Testimony:**

Robin Parkin, a neighbor, testified at trial. Parkin testified at trial that on April 18, 2022, around 1 or 2 a.m., Gunter and Sally began fighting on the hill across the street from her house and "kept the dogs riled up most of the night." The next morning, about 7:30 or 8:00, Parkin heard yelling in her driveway and one of her dogs alerted "that something more severe was going on outside[,]" so she followed the dog outside.

When she went outside, Parkin saw Gunter and Sally fighting in her driveway, and Gunter "had her in a bear hug to start with[.]" Parkin described that Sally had her back to Gunter, who "had his arms around her torso . . . with her arms pinned down . . . [i]n a bear hug[,] [a]nd he is trying to physically push her back up the hill to where they were staying." Parkin testified that Sally was struggling and yelling at Gunter "to let her go, that she was done with him, and that their relationship was over. And he wasn't having it." Parkin said that as Sally struggled to get loose, Gunter's "arm came up around her neck . . . and his hand came around her mouth." Parkin testified, "Sally was struggling against his arm at that point. And I yelled at him. I yelled at him several times."

3

Gunter did not respond to Parkin until she used his name and told him she was calling the police, and at that point, his hand came off Sally's mouth, and she broke free. Parkin also said that as Sally began moving away, Gunter "slapped her with the left hand across the back of the head." Parkin said that he struck her "pretty hard, but she ducked and started yelling at him" that she was leaving, and the relationship was over. Parkin testified that as Sally left the scene, she yelled, "'I can't believe it, you bit my nose, you bit my hand, . . . I may have to have stitches[.]'" According to Parkin, they had "quite a struggle" because Sally "already had bruises starting and she looked pretty roughed up."

Gunter did not object to Parkin's testimony.

**Deputy Michael Gates's Testimony:**

Michael Gates, the responding patrol deputy, testified at trial. Gates responded to the 9-1-1 dispatch, which came through as "a disturbance call." Gates met with Sally, who appeared "a little bit shaken, possibly a little bit nervous." Sally presented with injuries and told Gates how she received them. He also noted redness on her chest near her collarbone, which one of the photographs admitted without objection showed. Gates testified EMS evaluated Sally and explained he had responded to prior calls involving Sally and Gunter.

Gates testified that if statements implicate a possible strangulation, which he explained "could be as simple as a hand on the throat or over the face or mouth[,]"

4

they approach the investigation differently given "the extreme escalation of violence from an assault to a strangulation." Gates said they could not detain Gunter that day, as he had left the scene when they arrived, so they completed their report and referred the matter to a detective.

Gunter likewise did not object to Gates's testimony.

**Detective Zachary Winford's Testimony:**

Zachary Winford, a detective with the Montgomery County Sheriff's Office, testified that on April 19, 2022, he was assigned these cases. As part of his investigation, Winford met with Sally, re-interviewed her, and obtained her statement.

He knew that EMS checked Sally at the scene, but she declined to go to the hospital, so Winford arranged for her to have a forensic strangulation exam with Texas Forensic Nurse Examiners (TFNE) given the nature of the assault and to make sure she did not have further injuries requiring treatment. He testified that he reviewed the TFNE records as part of his investigation. After reinterviewing Sally, he determined they had probable cause and had a warrant issued to arrest Gunter. Winford explained he needed probable cause on the "impeding" element, which he believed existed after reviewing TFNE records, EMS records, the victim's statements, and the witness's statement.

**Kelsi Tombs's Trial Testimony and Objections to Exhibits 37 and 40:**

Kelsi Tombs is a TFNE clinical educator and testified at trial. Tombs described her education and training, which included a bachelor's degree in psychology, bachelor's degree in nursing, and a master's degree in forensic nursing. She explained that forensic nurse examiners have specialized training and education to care for patients who have experienced an assault or trauma. Tombs has performed over 300 forensic medical examinations, and more than 130 of those were strangulation assessments. Tombs testified that "strangulation can be used as a tool of power and control over someone . . . especially in domestic violence relationships, . . . the perpetrator can use strangulation as that tool to keep power and control over someone, controlling their breathing." Tombs described her process for conducting an assessment and what she looks for when a patient says they have been strangled. She testified her organization did an internal study of their strangulation patients and only forty-five percent had visible injury.

During Tombs's testimony, the State offered Exhibits 37, 38, and 40, which were TFNE records. State's Exhibits 37 and 40 are at issue for this appeal. Exhibit 37 contained a lengthy narrative that relayed in detail what Sally reported about the assault, the strangulation, and her injuries. Exhibit 40 was the asphyxiation assessment, which asked questions such as "Who strangled you?" and asked for details about how the strangulation occurred, and the pressure applied. In his brief,

Gunter complains of Sally's statements contained in those records that he strangled her, placed pressure on her neck and hand on her mouth, and she had trouble breathing during the assault. When the State offered the exhibits and specifically tendered Exhibit 37 to the defense, counsel asked to approach, and the following exchange occurred:

> [DEFENSE]: In these medical records are statements from her. I was told there is case law not allowing this to come in?
> THE COURT: So you are stating there are statements by her, the complainant?
> [DEFENSE]: By the complainant, yes.

The State responded that the statements were for medical treatment and diagnosis, which made the records nontestimonial. After sending the jury out, the conference regarding the admissibility of the records continued. The trial court noted the hearsay exception for Tombs as the custodian of records and the State's argument that the statements were made for purposes of diagnosis.

The trial court again expressed her belief there was a medical exception to the case and Exhibit 37 titled Medical Forensic Chart contained "a statement of what she told the nurse and what she told the nurse that the Defendant said to her and about where she was hit or how long she was hit." The trial court characterized the narrative as "pretty substantial" and covering "a whole page." The trial court then asked the defense, "But what is your objection to this exhibit?" Defense counsel

7

responded, "That is basically testimony[,] and I won't be able to cross examine her in any way."

The trial court then reiterated her concern they were out-of-court statements for the truth of the matter asserted, but there was a clear exception for medical records. The trial court also noted Gunter tried to "circumvent the rules by continuing to speak outside the presence of this court to the complainant[]" about trial strategy and that "obviously, she is available to him." Then, the following exchange occurred:

> THE COURT: . . . [T]he only part of the records that kind of give me pause is this big long paragraph. It is Page 3 of 29.
>
> [DEFENSE]: There is something on Page 1 as well where it asks "were you strangled" and "who strangled you?" I believe it is on 1 or 2.
>
> THE COURT: Okay. I am not concerned about that. And I understand your concern and you have objected.
>
> . . .
>
> THE COURT: I am A-okay with this witness testifying from this to refresh her memory.]
>
> . . .
>
> But I am going to redact Page 3.
>
> [DEFENSE]: . . . I appreciate that. One question, though. I don't think [Tombs] is the one that did the exam. She is the one that has reviewed the exam. So I am assuming that this person that took this record is no longer with this agency?

8

[STATE]: She is on maternity leave –

THE COURT: Hold on. [Tombs] is custodian of records. Plus I am going to find she appears to be an expert. She has done hundreds of exams. She has her master's. She is a forensic nurse. She is certified. So she is a medical professional that can testify based on this. So I am going to redact this from what we send back to the jury. I am going to admit Exhibit 37 without Page 3.

. . .

THE COURT: No. 37 is admitted with the redaction.
And then No. 40 is being offered. And what is the response of the Defense?

[DEFENSE]: I just object to a few things on here. The answers to this question –

THE COURT: No. 40 is -- looks like asphyxiation assessment.
Okay. Because I wasn't here when you were talking to the Defense, is it business records?

[STATE]: It is included in the assessment that was done by the Texas Forensic Nurse.

THE COURT: So it is part of this custodian's records that you are trying to put in?

[STATE]: That's correct, Judge.

THE COURT: And what is your legal objection?

[DEFENSE]: It is just basically hearsay on some of the questions that were asked where they ask "who strangled you?"

THE COURT: Okay. Your objection is overruled as to that.
And then what about the other one? There is 37 and 40.

[DEFENSE]: There is 38. And I am fine with 38.

9

THE COURT: Okay. So all of these, offer them when the jury comes back in; and I will admit them with the one redaction on 37.

After the hearing, Tombs's testimony resumed. When the State offered State's Exhibits 37, 38, and 40 again in front of the jury, defense counsel responded, "No objection[,]" and the trial court admitted them.

During her testimony, she was questioned extensively about State's Exhibits 37 and 40. Without objection, Tombs testified, "So after the hitting and the pushing and all of that, she then described Mr. Gunter putting her own forearm against her neck and then putting his hand over her mouth where she was unable to breathe." She also testified that while Sally first reported Gunter had just strangled her that morning, she eventually said that he had strangled her in the past. Tombs explained that Gunter applied pressure to Sally using "her forearm against her neck." She testified that Sally "had difficulty breathing and she had headaches. She also said she urinated on herself."

**Other Evidence:**

EMS records were admitted without defense objection. These records reflected they stemmed from a 9-1-1 call for an assault complaint, and she had been fighting since last night, among other things. Photographs of Sally's injuries were also admitted without defense objection. These photographs depicted various bruises, lacerations, what looked like a bite wound on her finger, and red marks around her collarbone area.

10

## II. Analysis

In one issue, Gunter complains the trial court erred by admitting hearsay evidence contained in State's Exhibits 37 and 40 from witnesses who did not testify at trial, which violated his constitutional right to confrontation. As outlined in his brief, Gunter complains of the following statements in Exhibits 37 and 40:

> [Nurse]: Is there anything else important that you think I should know?
> [Sally]: Only thing I didn't tell you is Sunday, he strangled me too.
> [Nurse]: Was there any external pressure placed around your neck?
> [Sally]: Yes[.]
> [Nurse]: Did someone's actions ever cause you to be unable to breathe or have trouble breathing during the assault?
> [Sally]: Yes[.]
> [Nurse]: Who strangled you?
> [Sally]: Gregory Gunter[.]
> [Nurse]: When were you strangled?
> [Sally]: Monday[.]
> [Nurse]: Where was the pressure applied?
> [Sally]: Neck and hand on my mouth[.]
> [Nurse]: What were you thinking during the assault?
> [Sally]: Lord if I can get out of here alive, I'm leaving.

The State responds, among other things, that Gunter failed to preserve error, and similar testimony was admitted elsewhere without defense objection, so any error was harmless.

**Applicable Law: Error Preservation**

To preserve a complaint for appellate review, a party must timely object to the evidence with enough specificity to let the trial court know what he wants and why. *See* Tex. R. App. P. 33.1(a). Generally, a party must continue to object each

11

time inadmissible evidence is offered. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (quoting *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)). The exception to this is when a party obtains a running objection, or the court hears the objection outside the jury's presence. *See id.*

A defendant's Confrontation Clause claims are subject to error preservation requirements. *See Davis v. State*, 313 S.W.3d 317, 347 (Tex. Crim. App. 2010) (noting Confrontation Clause claims are subject to Texas Rule of Appellate Procedure 33.1(a)(1)(A)'s error preservation requirements); *see also Lucio v. State*, 351 S.W.3d 878, 909 (Tex. Crim. App. 2011) (concluding defendant's objections failed to alert the court the evidence violated her Sixth Amendment right to confront witnesses, thus defendant failed to preserve error). A hearsay objection does not preserve an objection based on Confrontation Clause grounds. *See Reyna v. State*, 168 S.W.3d 173, 179 (Tex. Crim. App. 2005); *Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (concluding appellant failed to preserve error on Confrontation Clause grounds where he referenced only "hearsay" objection); *Holman v. State*, No. 09-16-00147-CR, 2016 WL 7473897, at *5 (Tex. App.—Beaumont Dec. 28, 2016, pet. ref'd) (mem. op., not designated for publication) (concluding defendant failed to preserve Confrontation Clause complaint where only objection to medical records at trial was hearsay).

"[U]nobjected-to testimony about objected-to evidence results in forfeiture of the objection[.]" *Lumsden v. State*, 564 S.W.3d 858, 888 (Tex. App.—Fort Worth 2018, pet. ref'd). An objection to exhibits does not preserve error for a witness's later testimony about those exhibits. *See Martinez*, 98 S.W.3d at 193 (concluding objections to photos during bench conference did not preserve error to other gang related evidence); *Hinton v. State*, No. 09-19-00134-CR, 2021 WL 194916, at *5 (Tex. App.—Beaumont Jan 20, 2021, no pet.) (mem. op., not designated for publication) (explaining that defense's initial objections to exhibits showing computer searches did not preserve error for the analyst's testimony).

**Application: Gunter forfeited his objection to State's exhibit 37 given the admission of unobjected-to witness testimony that contained the same information.**

The record reflects that when the trial court asked what his objection was to State's Exhibit 37, Gunter stated that it contained "basically testimony and I won't be able to cross examine her in any way." Assuming without deciding that this raised a Confrontation Clause objection to Exhibit 37, Gunter forfeited his objection when he failed to object to Tombs's later testimony about Exhibit 37. *See Martinez*, 98 S.W.3d at 193; *Lumsden*, 564 S.W.3d at 888; *see also Hinton*, 2021 WL 194916, at *5. Tombs's testimony and that of other witnesses presented the same evidence, as it described what Sally reported to medical professionals during her examination.

*See Martinez*, 98 S.W.3d at 193; *Lumsden*, 564 S.W.3d at 888; *see also Hinton*, 2021 WL 194916, at *5.

Tombs explained how Sally described Gunter strangled her by applying pressure to her neck using her forearm and covering her nose and mouth with his hand. Tombs also testified that Sally told the nurse examiner she felt short of breath or could not breathe, and she described the other injuries Sally reported receiving when Gunter assaulted her. Tombs discussed some of Sally's additional injuries as shown in photographs and a diagram completed by the original nurse examiner, which included bruising and bite marks. Since the same evidence was admitted through Tombs's testimony when she discussed these medical records, and Gunter failed to object to that testimony, we conclude that he forfeited his objection to State's exhibit 37. *See Martinez*, 98 S.W.3d at 193; *Lumsden*, 564 S.W.3d at 888; *see also Clay v. State*, 361 S.W.3d 762, 766–67 (Tex. App.—Fort Worth 2012, no pet.) (concluding that defendant forfeited his objection to the admission of records where a witness provided unobjected-to testimony about them).

**Application: Any complaint about the admission of State's Exhibit 40 on confrontation grounds was not preserved.**

We next turn to State's Exhibit 40. Most claims involving a trial court's admission of evidence are subject to the rules of error preservation, including those asserting a violation of a defendant's constitutional right to confront the witnesses used against them in a trial. *See Davis*, 313 S.W.3d at 347; *see also Lucio*, 351

S.W.3d at 909. As outlined above, when the trial court asked for Gunter's legal objection to State's Exhibit 40, he only lodged a hearsay objection. We hold that Gunter failed to preserve any claim that the admission of State's Exhibit 40 violated his right to confrontation, having failed to mention his right to confrontation in connection with that exhibit. *See Reyna*, 168 S.W.3d at 179; *Paredes*, 129 S.W.3d at 535; *Holman*, 2016 WL 7473897, at *5; *see also* Tex. R. App. P. 33.1(a)(1)(A).

We overrule Gunter's sole issue.

### III. Conclusion

Having overruled Gunter's sole issue, we affirm the trial court's judgments.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on February 6, 2024
Opinion Delivered February 28, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.