**Affirm and Opinion Filed August 27, 2024**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-23-01003-CR**

**GIFT ESEOGHENEGBUYOTO OJIE, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 401st Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 401-85078-2023**

## MEMORANDUM OPINION

Before Justices Molberg, Nowell, and Kennedy
Opinion by Justice Molberg

A jury found appellant Gift Ojie guilty of indecency with a child by sexual contact, and the trial court assessed punishment at nine years' confinement. In one issue, appellant contends the trial court abused its discretion in admitting, over his hearsay objection, a note written by the complainant concerning the alleged act of indecency. We affirm in this memorandum opinion.

## Background

A.K., who was eighteen at the time of trial, testified that her mother (Mother) met and married appellant in 2017. That year, when A.K. was in seventh grade, they

moved to the Cortona Apartments in Fairview, Collin County, Texas. A.K. lived there with Mother, appellant, and her two younger brothers.

At first, her relationship with appellant was good—"he was nice, friendly"—but, at some point in time, he began making "rude comments about" A.K.'s body. He commented on A.K.'s butt and breasts, telling her "they were big at that time" and were "shaped more like a grown woman['s]" than someone her age. A.K. said Mother was around when appellant made some of these comments. Mother seemed to brush off appellant's comments, and A.K. felt like Mother did not care.

A.K. said that shortly after appellant moved in with them, he also began trying to touch her body. A few times, he touched or slapped her butt without saying anything to her—"he would just be smiling." A.K. did not know how to react to this behavior and did not say anything to appellant because she was "just too scared" and did not know what to do. She was worried that if she said anything to Mother, he would hurt A.K. or Mother.

Once, when A.K.'s mother had gone to the grocery store, A.K. was eating cereal at the kitchen table when appellant sat down next to her and began making small talk. Appellant showed A.K. a pornographic video on his phone and commented on "how rough they were being" in the video before asking her to re-create the video. A.K. said the next thing she remembered was standing up and appellant "was kind of rough" and put both of his hands on her breasts while she was facing him. Appellant had a "good grip" of her breasts and then moved his hands in

–2–

a circular motion. A.K. did not know what to say, and appellant did not say anything to her at that point in time. A.K. described appellant's expression as "grinning" and "evil." She was worried appellant was going to hurt her, but eventually it stopped. A.K. tried to finish her food in the kitchen, and appellant went back to his bedroom. A.K. then went to her bedroom and started crying and "pretty much stayed" there for the rest of the day because she did not want to be around anyone. A.K. did not think about telling Mother because she "couldn't even really process what happened," and she was scared about what appellant might do in response. A.K. tried to avoid appellant after this incident and stayed in her room more.

At the time, A.K. did not know much about sex and had not had any conversations with Mother about what sex is. She testified she thought she was thirteen at the time of the incident. She said she turned thirteen when they were living at the Cortona.

Later, when A.K. was in ninth grade, the family, including appellant, moved into a townhome in McKinney. Appellant's comments and inappropriate touching did not stop during the time they lived there. A.K. said one incident that happened in this house stood out in her memory. She was washing dishes in the kitchen in the afternoon when appellant approached her from behind and wrapped his arm around her waist so she could not move. A.K. felt appellant's mouth and teeth on her ear. She did not think anyone else was home at the time. A.K. was able to make a jerking movement to push appellant off and went to her room, and appellant "just kind of

laughed." A.K. said it reminded her "of the first time he tried something" and "it just felt nasty." A.K. decided to tell Mother because she wanted it to stop; but when she tried to tell her about appellant's conduct, Mother told her "not to say things like that." A.K. felt like no one would believe her. Her relationship with Mother started to change and they began arguing more. A.K. felt aggravated because Mother "was blind to the stuff that was going on."

Towards the fall of her sophomore year of high school, A.K. went to stay for a couple of weeks with her older sister, D.W., a teacher, after Mother had kicked A.K. out of the house following an argument. A.K. returned home and things were good with Mother again, but that eventually changed when they got "back into the same argument again," which was about whether Mother prioritized men over her children and took appellant's side.

D.W. came and picked her up and A.K. ended up living with her for the rest of high school. A.K. said D.W. was "like a second mom to me." After she had been living with D.W. for a few months, A.K. told D.W. about appellant's conduct. One evening, A.K. was washing dishes and started crying, "maybe because of the song that was playing . . . reminded me of everything that was happening with my mom" and she started thinking about "the stuff that happened with [appellant]." D.W. noticed and asked A.K. what was wrong. When A.K. could not answer her, D.W. gave A.K. her cell phone with the Notes application opened and told her to type out what was bothering her. A.K. took D.W.'s phone and typed out a note.

The State took screenshots of the note and sought to admit them as State's Exhibit 6. Appellant objected on hearsay grounds. The State responded it was not offering the note for the truth of the matter asserted but "because it goes to the victim's state of mind as to what she was thinking and what she was saying, what she was communicating and how and why she was able to communicate it," and to rebut the defense's theory of fabrication. The trial court sustained appellant's objection.

Sergeant John Duscio testified he was assigned to A.K.'s case. He said the specific allegation in the case was "touching over the clothes" "of female breasts." Defense counsel cross-examined Duscio about why a child might fabricate an allegation of sexual indecency. Duscio agreed someone might make a false accusation to get out of trouble, for vengeance, due to mental illness, or to manipulate one's living arrangements. He also agreed that a child might prefer to live in a home where there are fewer rules. Duscio did not know whether A.K. was in trouble when she made the accusation. As to vengeance, he said A.K. had "some misunderstanding with her mother, which is why she left" Mother's house and moved in with her sister. Duscio was unaware whether A.K. had any mental health issues.

Duscio also testified he learned from Mother that while A.K. had some behavioral problems, it was "typical sixteen-year-old behavior" and nothing that concerned him in his investigation. After interviewing D.W., Duscio did not have

any concerns that A.K. was using the allegation to manipulate her living arrangements, was trying to get out of trouble, or was acting out of vengeance. He said neither Mother nor D.W. ever told him anything about mental health problems regarding A.K. He also said he observed A.K.'s forensic interview and said her demeanor did not seem vengeful or angry towards appellant. He tried to get in contact with appellant but never heard back from him.

D.W. testified she had more of a mother–daughter relationship with A.K. than a sister–sister relationship due to their age difference—D.W. is thirteen years older than A.K.—and past situations where D.W. had to step in and help A.K. D.W. said she was "more strict on [A.K.] than" than Mother was.

D.W. said that when A.K. moved in with her, A.K. was reserved and stayed in her room a lot. On the day A.K. told D.W. what happened with appellant, D.W. said A.K. was washing dishes after dinner and began crying. D.W. could not get A.K. to calm down and asked her whether something had happened and told her, "If you can't say it, then you type it out." D.W. handed A.K. her iPhone with the Notes application pulled up, and A.K. "ended up typing out a message and letting me know what happened." D.W. read the note and was in shock about what she learned. She determined she had to report appellant. The State again offered into evidence screenshots of A.K.'s typed note, and the trial court admitted it over appellant's hearsay objection for "the limited purpose of showing her demeanor and what she did." A.K.'s note, admitted as State's Exhibit 6, reads in full as follows:

When I was in the 7th grade and living the cortana, with mom and the boys and [appellant]. I don't know how we were alone but we were and [appellant] I guess was trying to recreate or show me something he had watch. And he was explaining it to me, and Im 13 and no grown adult man should be doing this with a little girl. Barely 13. And he touched my boob and we're messing with them. And when it happened I was confused and I didn't know what to do so I just tried to act normal and went in my room. I knew mom wasn't gonna believe me if I told her and so I kept it a secret and tried to deal with it on my own. And when I finally built up the courage to tell her, she just told me to shut up and that I shouldnt accuse him of being a pedophile. And it broke me cause she's my mom so I've been dealing with it since then. And it's been messing with my mind for the past year. Eating at me and killing me. So when I saw his call, it brought back memories of him and mom and everything. As I hate myself for it. I was so scared to tell anyone else about it.

The trial prosecutor then questioned D.W. about the contents of the note.

D.W. said A.K. spoke with Mother on a weekly basis when A.K. lived at D.W.'s home. She was unsure how often, if ever, appellant reached out to A.K., but believed he did once on the day A.K. broke down and told her about what happened because A.K. told her appellant had called her earlier. D.W. said "the reason why it triggered her is because one time he came up to her neck, kissing her on her neck and - - and feeling on her, she was washing dishes. So that's the reason why she broke down when I said something about washing dishes."

D.W. called, among others, Mother, who did not believe the incident happened and seemed concerned about A.K. but also "other things outside of [A.K.]" D.W. said she wanted to give Mother a chance to report the incident. D.W. and A.K. picked up Mother and their two younger brothers the next day and went to Walmart,

but appellant showed up to get Mother. D.W. and A.K. begged Mother not to leave with appellant but she did. D.W. took the two boys and A.K. back with her, and later that night, reported the incident to child protective services.

D.W. said it had been difficult watching A.K. go through dealing with the incident and the fallout. She said "oftentimes [A.K.] will be crying or upset in her room, and I will just -- just sit there with her and tell her, [A.K.], I know it's hard. Like, You've had a hard life, but you will get past this. You don't have to -- you know, You don't have to do it alone. I'm here to support you along the way."

Among other matters, Morgan Wilkerson testified she conducted a forensic interview of A.K. in January 2021 at the children's advocacy center. She said A.K. was able to speak with her in a developmentally appropriate way and could distinguish between the truth and a lie. A.K. was emotional, upset, and quiet; she did not seem like she wanted to be at the center talking about the incident. Wilkerson said A.K. articulated that an offense was committed against her when she was twelve or thirteen by her stepfather. She said A.K. provided her sensory details of what happened to her, and she was consistent throughout the interview. Wilkerson said A.K. did not seem vindictive towards appellant, and she did not notice any red flags she felt like she needed to follow up on. Wilkerson said it is common for an abused child to have an unsupportive parent, which can be "a big barrier to disclosure." Wilkerson's training involved spotting manipulation and grooming, and she said

A.K. "disclosed to me about what was shown to her, as well as the things that were communicated to her."

Appellant testified that neither A.K. nor D.W. approved of his marriage to Mother. He was surprised a child such as A.K. was vocal about adult matters and said that, generally, A.K. considered herself to be an adult and did not want to follow Mother's rules. He left dealing with A.K. to Mother because he viewed A.K. as "bold" and "disrespectful." He thought A.K. started dressing inappropriately, which he communicated to Mother but not to A.K. directly.

Appellant said the detective investigating the case tried to contact him when he was in Nigeria. But he said he tried to speak with the investigating detective multiple times after that but never heard back from him. He did not think the police did much to investigate the case.

Appellant said he did not commit the offense. He believed A.K. fabricated the allegations because she did not want to return home to live with Mother. He also said A.K. viewed him as competition for Mother's attention and wanted to get rid of him.

At the time A.K. said the offense occurred, appellant said he was working three jobs, which amounted to between 96 and 113 hours per week. He said, at the time, he and Mother shared one car. They would take the children to the bus stop at six in the morning so they could go to school, appellant would drop Mother off at her work, and then appellant would go to work. After work, appellant would go to

–9–

his delivery job, and after that he would work a job at the American Airlines Center until two or three in the morning. So, he said, he was never home and always working. He could not remember a single time he was home alone with A.K. On cross-examination, he acknowledged he came home to sleep and was home in the morning to eat breakfast, in addition to having some holidays and days off. He denied ever watching pornography or making inappropriate comments towards A.K.

Appellant said A.K. lied when she said she turned thirteen when they lived at the Cortona. She was born in October 2004 and turned thirteen in October 2017. Appellant said A.K. said the offense occurred prior to October 2017, yet, he said, they moved into the Cortona in November 2017. The trial court admitted a lease contract for a unit at the Cortona, signed by Mother and appellant, showing that the term of their lease did not begin until November 18, 2017. He also did not believe A.K. would have been left at home when Mother went to the grocery store because A.K. "goes everywhere with her mom" and A.K. looked forward to going to the store with her.

Appellant said he did not mean to call A.K. on the day she told D.W. that appellant had inappropriately touched her. He intended to call A.K.'s brother and mistakenly dialed A.K.'s number.

Appellant testified he saw D.W.'s testimony and saw the note A.K. wrote to her when it was admitted in evidence. The trial prosecutor asked him, "You would agree with me that that note is pretty consistent to what [A.K.] told the police, the

–10–

forensic interviewer, [D.W.], and everybody in open court on this stand this morning, right?" Appellant responded, "That's her testimony, yes."

Appellant said Mother asked him to show up at Walmart to meet her the day after A.K. told D.W. about appellant's conduct. He was not aware A.K. had made any accusations at the time he picked her up. Appellant went to Nigeria three days after that, because, he said, he already had a trip planned. He was in Nigeria from the end of December and returned on February 2.

Appellant said he spoke with Mother about the allegations and told her A.K. "did not want to come back home because she had started living another life when she knows her home is there already, and . . . she's just wanting to get me out of the way." Appellant denied that Mother or anyone else in the family was afraid of him.

Defense counsel also recalled Detective Duscio to testify. Duscio disagreed there was a timeline problem with the State's case if the family moved into the Cortona in November 2017. He said that children are not always good with dates. Defense counsel inquired, "If she said it was prior to her thirteenth birthday at the Cortona Apartments, can you concede that that's a problem if they didn't live in the Cortona Apartments when she turned 13?" Duscio responded, "Sure."

Counsel questioned Duscio regarding the note A.K. typed on D.W.'s phone. He said A.K. did not say anything about a note on her sister's phone during the investigation and he was unaware when the note was turned over to the prosecution. On re-direct, Duscio said, among other things, there had been no dispute the family

–11–

lived at the Cortona in the fall of 2017. He did not think a three-week discrepancy discredited A.K. or the specific details she recalled about the incident. The trial prosecutor also reviewed A.K.'s note with Duscio, who said the contents of the note were consistent with what A.K. said in the forensic interview and what he learned in the course of his investigation.

The State recalled A.K. as a rebuttal witness. Among other things, she testified appellant touched her breasts at the Cortona, around the time of her thirteenth birthday. She said it would not surprise her if she was off by three weeks and they had not moved into the apartment until November 2017.

## Discussion

In his sole issue, appellant contends the trial court abused its discretion in admitting A.K.'s written note over his hearsay objection. In response, although the State does not concede the trial court abused its discretion, it only argues appellant was not harmed by any error in the admission of the note. We will assume without deciding the trial court erred in admitting the note and evaluate any error for harm.

The erroneous admission of hearsay evidence is nonconstitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). Nonconstitutional error requires reversal only when the error affects a party's substantial rights. *See* TEX. R. APP. P. 44.2(b). Error that has a substantial and injurious effect or influence in determining the jury's verdict affects a party's substantial rights, *see Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010), while error that does not

–12–

influence the jury, or has but very slight effect, does not affect substantial rights, *see Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016).

We analyze the whole record to determine the effect of the trial court's error, considering all of the evidence, the nature of the evidence supporting the verdict, and the character of the error and its relationship to other evidence. *See Gladney v. State*, No. 05-11-01088-CR, 2012 WL 5949473, at *1 (Tex. App.—Dallas Nov. 28, 2012, pet. ref'd) (mem. op., not designated for publication). The improper admission of evidence is harmless if the same or similar evidence is admitted without objection at another point during trial. *Estrada v. State*, 313 S.W.3d 274, 302 n.29 (Tex. Crim. App. 2010); *Jenkins v. State*, No. 05-22-01003-CR, 2024 WL 412518, at *6 (Tex. App.—Dallas Feb. 5, 2024, pet. ref'd) (mem. op., not designated for publication).

We conclude any error in the admission of the note did not have a substantial and injurious influence in determining the jury's verdict. First, A.K. testified at trial about appellant's conduct constituting the alleged offense, and the note repeated parts this testimony. As described above, as pertinent here, A.K. testified appellant showed her pornography on his phone, commented on it, and wanted to recreate it with her; appellant grabbed her breasts and moved his hands in circular motion around them; afterwards, she tried to finish eating breakfast in the kitchen before returning to her bedroom; she told Mother about the incident, who told her not to say things like that; and the incident affected her greatly. Similarly, in the note, A.K. stated appellant wanted to show or recreate with her something he had watched; he

–13–

touched or messed with her breasts; she returned to her room afterwards; eventually, she told Mother, who told her to keep quiet about the incident; and the incident caused her great distress. Second, other evidence was admitted without objection showing the note to D.W. existed and A.K. accused appellant in the note of the conduct testified to at trial. A.K. testified she typed out a note on D.W.'s phone describing the incident with appellant. Similarly, D.W. testified A.K. typed out a note on her phone describing conduct she knew she had to report.

Given the above, we conclude any error in the note's admission did not affect appellant's substantial rights. *See Torres v. State*, No. 05-22-00314-CR, 2023 WL 4861780, at *3 (Tex. App.—Dallas July 31, 2023, no pet.) (mem. op., not designated for publication) (concluding witness's repetition of complainant's out-of-court statements "largely repeated certain testimony from the unobjected-to trial testimony of the alleged victim and her mother regarding [the appellant's] conduct" and was harmless); *Lumsden v. State*, 564 S.W.3d 858, 891 (Tex. App.—Fort Worth 2018, pet. ref'd) (concluding erroneously admitted video recording of forensic interview was harmless when video "provided essentially the same story" as complainant's testimony and it was "unlikely that the jury was inclined to reject [complainant's] story of sexual abuse but changed its mind after hearing it again in the recording").

## Conclusion

Having overruled appellant's sole issue, we affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)
231003F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

GIFT ESEOGHENEGBUYOTO
OJIE, Appellant

No. 05-23-01003-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 401st Judicial
District Court, Collin County, Texas
Trial Court Cause No. 401-85078-
2023.
Opinion delivered by Justice
Molberg. Justices Nowell and
Kennedy participating.

Based on the Court's opinion of this date, the judgment of the trial court is
**AFFIRMED**.

Judgment entered this 27th day of August, 2024.